**J.C. PENNEY COMPANY, INC., Plaintiff,**

v.

**GIANT EAGLE, INC., Giant Eagle Markets, Inc., and Stanley R. Gumberg, individually and as Trustee under those certain Irrevocable Deeds of Trust dated May 9, 1969, Defendants.**

**Civ. A. No. 92–1769.**

United States District Court, W.D. Pennsylvania.

Sept. 16, 1992.

Ralph A. Finizio, Margaret F. Houston, Pittsburgh, PA, for plaintiff.

Bernard Marcus, Stephen White, George B. Foster, Pittsburgh, PA, for defendants.

## OPINION

LEE, District Judge.

## I. PROCEDURAL BACKGROUND

1. The plaintiff, J.C. Penney Company, Inc. ("J.C. Penney") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in the State of Texas.

2. Defendant, Giant Eagle Markets, Inc. is a corporation organized and operating under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania, as is defendant, Giant Eagle, Inc. Inasmuch as the parties have not differentiated these two corporate entities in their pleadings or in the hearings conducted in this Court, the Court will use "Giant Eagle" to refer to both corporate defendants collectively.

3. Defendant, Stanley R. Gumberg ("Gumberg"), is a citizen of Pennsylvania, with his place of business in Pittsburgh, Pennsylvania.

4. On August 13, 1992, J.C. Penney filed a Verified Complaint to Enjoin Operation of Drug Store operated by Giant Eagle at a shopping center owned by Gumberg.

The Complaint alleges: (i) Gumberg is the owner and landlord of a shopping center known as Quaker Village Shopping Center in the Borough of Leetsdale, Allegheny County, Pennsylvania, and that J.C. Penney has the exclusive right to operate a drugstore in Quaker Village in which a registered pharmacist is in attendance; (ii) Giant Eagle is a party to a 1977 lease with Gumberg which permits Giant Eagle to operate a food supermarket at the shopping center; (iii) Giant Eagle is remodeling its supermarket and preparing to open a drugstore or drug department within its supermarket in which a registered pharmacist is in attendance, in violation of J.C. Penney's exclusive lease with Gumberg;[1] (iv) that Gumberg's acquiescence to Giant Eagle's addition of a drugstore having a pharmacy department is a breach of J.C. Penney's "exclusive" provision with Gumberg; (v) Giant Eagle has intentionally interfered with existing contractual relationships between Gumberg and J.C. Penney. J.C. Penney filed Motions requesting this Court to enter a temporary restraining order, a preliminary injunction and a permanent injunction enjoining the opening and operation of the Giant Eagle drugstore in violation of the exclusive terms of the lease between Gumberg and J.C. Penney.

5. *Jurisdiction*

The Court finds and concludes that it has diversity jurisdiction over the subject matter of this action pursuant to § 1332 of Title 28 of the United States Code because there is complete diversity of citizenship between the plaintiff, a Delaware corporation with its principal place of business in Texas, and defendants, all citizens of Pennsylvania doing business in Pennsylvania, and the amount in controversy exceeds $50,000, exclusive of interest and costs.

6. On August 13, 1992, the Court heard J.C. Penney's request for a temporary restraining order, which request was denied on that day. A hearing on J.C. Penney's Motion for Preliminary Injunction was conducted on August 28, 1992. J.C. Penney and Giant Eagle have submitted Proposed Findings of Fact and Conclusions of Law. After due consideration of the Proposed Findings of Fact and Conclusions of Law, the oral testimony and exhibits introduced at the hearing on the preliminary injunction, and the arguments of the parties, this Court grants plaintiff's Motion for a Preliminary Injunction enjoining defendant, Giant Eagle, from operating a pharmacy department in its supermarket at Quaker Village.

## II. FINDINGS OF FACT

### A. THE 1962 LEASE

1. In 1962, J.C. Penney's predecessor in interest, the Thrift Drug Company of Pennsylvania, ("Thrift") and Gumberg's predecessor in interest, Quaker Village, Inc., entered into a lease agreement whereby Thrift rented 81,000 square feet of first floor storeroom space at a shopping center to be constructed and operated as Quaker Village Shopping Center in the Borough of Leetsdale. (Plaintiff's Exhibit 1 at 1, paragraph 1.)

2. The lessor, Quaker Village, Inc., warranted that it would have certain key tenants who would continuously occupy stores in the shopping center for the term of the lease, namely Thorofare Markets, Inc., which would operate a supermarket, and Triple "A", which would operate a national chain variety store. The term of the lease was 15 years, with the option granted Thrift to renew and extend the lease for three additional terms of five years each upon proper notice to the lessor. (Plaintiff's Exhibit 1, paragraphs 2, 6, 7.)

3. This lease also provided the "demised premises shall be used by Tenant only for the operation of a retail drugstore business," and granted tenant the "right to display therein all such articles as are displayed and sold by it in its other retail drugstores and the right to operate a soda fountain and luncheonette." (Plaintiff's Exhibit 1, paragraph 10.)

---

**1.** At the hearing on J.C. Penney's Motion for a Preliminary Injunction, this Court was informed that Giant Eagle's pharmacy department has been operating since August 13, 1992.

4. The lease contained the following restrictive covenant, or as J.C. Penney refers to it, "exclusive":

9. The *Lessor covenants* and agrees that *it will not* during the term of this lease, or any renewal or extension thereof, *lease, rent, occupy, or permit to be occupied as a drug store, or for the filling or selling of prescriptions, any other part of the aforesaid shopping center* or any extension or enlargement thereof. This covenant shall run with the land and, in the event of a breach thereof, Tenant shall be entitled to cancel this lease and/or to full and adequate relief by injunction or other equitable proceedings, and/or to damages for such breach. These provisions, however, shall not be construed to prevent the sale by the supermarket or the variety store, as an incident to their regular business, of some articles of merchandise customarily sold in drug stores, *provided said other tenants do not compound or sell prescriptions*, or sell merchandise which is limited by state law or State Board of Pharmacy regulations to sale in licensed pharmacies.

Plaintiff's Exhibit 1, paragraph 9. (Emphasis added.)

5. A memorandum of lease, or short form lease, was recorded in the Allegheny County Recorder of Deeds Office on March 2, 1962, pursuant to the Act of June 2, 1959, P.L. 454 §§ 1–7, 21 Pa.Stat.Ann. §§ 404–410 (Supp.1992). This memorandum set forth a description of the demised premises leased by Thrift, the date of commencement of the term of the lease, and the term of the lease and its options to renew, and other information. (Plaintiff's Exhibit 2.)[2]

6. J.C. Penney considers an exclusive pharmacy provision in a lease critical to providing a competitive edge in the pharmacy business, always seeks to negotiate exclusives in its shopping center leases, and considers exclusives to be a "very important, if not the most important, provi-

sion in a lease." (J.C. Penney Proposed Finding of Fact 24; Exhibits 4–6, 11–12.)

7. When J.C. Penney has the only pharmacy in a shopping center, it attracts customers who would not otherwise enter the store and purchase non-prescription items were it not for their need for prescription drugs. Such non-prescription items account for almost half of the sales in a typical Thrift Drug Store, and the loss of an exclusive provision produces a "ripple effect" because, when J.C. Penney loses prescription drug business of its customers, it also loses all of the other non-prescription sales that accompany the customers' purchase of prescription drugs.

### B. THE GIANT EAGLE LEASE—1977

8. On September 21, 1977, Giant Eagle agreed to lease a one-story storeroom of approximately 37,000 square feet at Quaker Village from Gumberg for a term of 20 years, with an option to extend the term of the lease for four successive periods of five years each. (Plaintiff's Exhibit 18, paragraphs 1, 4, 6.)

9. This lease provides:

*Use of Demised Premises*
Tenant shall use the demised premises *as a food and grocery super market for the sale of items customarily sold in the markets which it operates in the greater Pittsburgh area*, including but not limited to the right to operate a bakery and/or a restaurant minor in nature to main business on the demised premises....

(Plaintiff's Exhibit 18, paragraph 16.) (Emphasis added.)

10. Giant Eagle's Quaker Village lease also contained an exclusive provision designed to protect Giant Eagle from competition in the shopping center, with some exceptions. Paragraph 30 provides:

*Restrictive Covenant*
A. Landlord covenants and agrees that no other space in the Shopping Center of which the demised premises are a part,

---

2. Although the memorandum does not refer to or set forth the restrictive covenant, recording of such a memorandum constitutes constructive notice of all of the provisions of the lease. 21 Pa.Stat.Ann. § 407.

... will be leased to a store doing business exclusively as a food or grocery supermarket, or to a store primarily selling fresh foods, meats, vegetables or fruits, and that a general food department or department selling fresh meats or vegetables will not be permitted in any store in the Shopping Center, provided, however, that said restriction ... will not apply to the existing Thorofare Market ... or any future substitute food operation in said space, nor to the operation of a restaurant or the sale of specialized food items, such as delicatessen foods ... candy, baked goods, dairy products, cheeses, health foods, epicure shops and the like, but shall apply to the sale of fresh meats and produce in any type of store excepting the said Thorofare space as aforementioned.

(Plaintiff's Exhibit 18, paragraph 30.)

### C. THE 1978 LEASE

11. From 1975 through 1977, J.C. Penney discussed with Gumberg or his agents his proposal that J.C. Penney relocate its drugstore in the Quaker Village Shopping Center. Throughout these discussions/negotiations, J.C. Penney emphasized the importance of retaining its exclusive pharmacy right, and insisted that the transaction be structured so as to maintain the continuity of the 1962 lease, including the exclusive pharmacy right contained in that lease. (Testimony of Mr. Donald Harr, August 28, 1992; Plaintiff's Exhibits 3–6.) J.C. Penney gave considerable attention to the timing of the termination of the 1962 lease and the commencement of the 1978 lease, structuring the transactions so that the 1962 lease would terminate on October 31, 1978, one day after the 1978 lease. Thus, there was no gap in J.C. Penney's tenancy or in its exclusive pharmacy provision.

12. The 1978 lease provided that J.C. Penney would relocate to another location in the shopping center which it leased for a term of 15 years, with an option to extend or renew the lease for three successive five year terms. (Plaintiff's Exhibit 8, 2.)

13. The use provision of the 1978 lease provides that the demised premises

may be used for the operation of a drug store, or drug department, in which a registered pharmacist is in attendance, for the sale of health and beauty aids, and in addition, for the sale of any and all other items or services now or hereafter sold by the Thrift Drug Company ... or by other drug stores of comparable size throughout the country.

(Plaintiff's Exhibit 8, 3(a)) This clause further provides that the demised premises can be used for any other lawful purpose not prohibited by a provision in another tenant's lease of premises within the shopping center which grants such tenant an exclusive right to operate a particular type of store or business or prohibits the landlord from leasing, using or permitting to be used other premises in the shopping center for specific purposes. *Id.*

14. The 1978 lease contains the following provision granting J.C. Penney the exclusive right to operate a drugstore at Quaker Village:

*Exclusive Tenancy.*

Landlord covenants and agrees that during the term of this lease *Landlord will not use or occupy, or permit the use or occupancy of, any space* not hereby demised to Tenant, which is located *within the Entire Premises for* (i) *the operation of a drug store, or a drug department, in which a registered pharmacist is in attendance* or required by law to be in attendance for any period of time or (ii) the operation of any store primarily engaged in the sale of health and/or beauty aids, *nor will Landlord enter into any lease of such space which will permit the tenant* or any subtenant thereunder or assignee thereof *to use or occupy the space so leased for any of said purposes* during the term hereof. The foregoing provisions, however, shall not be construed to prevent the sale by Landlord's supermarket or variety store tenants, as an incident to their regular business, of some articles of merchandise customarily sold in drug stores, *provided said* supermarket or variety store *tenants shall not compound or sell prescription drugs* or sell any merchandise which is limited by federal, state or local

law or by regulation of the State Board of Pharmacy to sale in licensed pharmacies.

Landlord further covenants and agrees that Landlord will not sell or otherwise dispose of any property constituting all or part of the Entire Premises not hereby demised to Tenant without effectively and adequately restricting the subsequent use and occupancy of such property during the term of this lease to purposes other than the operation of retail businesses of the type described in the immediately preceding paragraph. *It is the intention of Landlord to hereby grant to Tenant the exclusive right to operate and conduct within the Entire Premises the aforesaid types of retail businesses so long as this lease remains in effect. Landlord covenants and agrees that rights similar to the rights herein granted by Landlord to Tenant are not held by any other tenant* or occupant of space *within the Entire Premises.*

(Plaintiff's Exhibit 8, 17(a) [emphasis added].)

15. The lease further provides certain remedies to the tenant in the event of the landlord's default, and that the provisions for remedies

shall not be deemed to deny to Tenant or limit its right to obtain injunctive relief or specific performance of Landlord's covenants hereunder or to avail itself of any other right or remedy ... which may be accorded Tenant by law or under the terms of this lease by reason of Landlord's failure to perform its obligations hereunder ...

(Plaintiff's Exhibit 8, 19.)

16. The 1978 lease further provides that the 1962 Thrift Lease

shall be and the same is hereby cancelled and terminated and of no further force or effect as of midnight of the day ("termination date") following the date upon which the term of the this lease commences ...

(Plaintiff's Exhibit 8, 18.) On January 3, 1979, a "Lease Cancellation Agreement" was recorded in the Recorder of Deeds Office of Allegheny County, which stated:

The existing Lease shall be, and hereby is, cancelled and terminated and rendered null and void and of no further force or effect whatsoever, effective as of midnight, October 31, 1978....

(Plaintiff's Exhibit 10.)

**D. CURRENT EVENTS**

17. On several occasions, including in October 1990, Gumberg requested J.C. Penney to waive its exclusive pharmacy clause. Gumberg's agents made this request to accommodate Giant Eagle's plans to expand its supermarket and operate a pharmacy department. (Plaintiff's Exhibit 13.)

18. In 1977, Giant Eagle had no pharmacies in any of its supermarkets in the Pittsburgh area. In the years since, the supermarket business had undergone sweeping changes and Giant Eagle has introduced various new product lines and services (flowers, books and cards, videos). Some 88 of 131 Giant Eagle's stores in the greater Pittsburgh area now have pharmacy departments. In 1991, Giant Eagle again notified Gumberg that it planned to open a pharmacy department in its Quaker Village store, and Gumberg notified J.C. Penney of Giant Eagle's intentions and again requested a waiver of its exclusive pharmacy clause which J.C. Penney again refused to give.

19. In March of 1991, an agent for Gumberg advised Giant Eagle that J.C. Penney had the exclusive pharmacy rights at Quaker Village, and Giant Eagle was aware at least by that time that both Gumberg and J.C. Penney recognized J.C. Penney's exclusive pharmacy rights and that J.C. Penney was unwilling to waive those rights. (Plaintiff's Exhibit 20.)

20. On May 9, 1992, Giant Eagle posted a small building permit at its Quaker Village store indicating that it was constructing a "pharmacist & prescription" store. (Defendants' Exhibit E.) Construction began shortly thereafter.

21. On June 26, 1992, J.C. Penney learned for the first time that Giant Eagle was going ahead with remodeling at its

Quaker Village store in order to open a pharmacy department. That day, J.C. Penney contacted agents of Gumberg who said they knew nothing of Giant Eagle's pharmacy plans. One of the agents, John Kramer, was unaware of Giant Eagle's remodeling activities and requested Mr. Harr of J.C. Penney not to send any notices or letters until he (Kramer) returned from vacation. Mr. Harr agreed, and held the warning letter that he had previously asked legal counsel for J.C. Penney to prepare. Upon his return from vacation, Mr. Kramer was still unable to provide any information to J.C. Penney, at which point it sent its warning letter. (Testimony of Mr. Donald Harr.)

22. On July 10, 1992, legal counsel for J.C. Penney notified Gumberg, with certified copy to Giant Eagle, that Giant Eagle's installation of a pharmacy department at the shopping center violated J.C. Penney's exclusive in its 1978 lease and requested Gumberg respond as to how he would protect Penney's rights under the lease. (Defendants' Exhibit F.)

23. Giant Eagle's response of July 28, 1992, stated its position that its lease with Gumberg was executed prior to J.C. Penney's 1978 lease. (Defendants' Exhibit F.) By letter dated August 11, 1992, plaintiff's counsel advised Giant Eagle that J.C. Penney has had a lease in effect containing an exclusive tenancy provision at all times since January 30, 1962, and that it intended to enforce that provision against Giant Eagle and Gumberg. (Defendants' Exhibit H.) On August 13, 1992, Giant Eagle opened the pharmacy department at its Quaker Village store, and began to fill prescriptions.

24. At the time of the hearing on August 27th, 16 identified customers of Thrift Drugs had switched allegiance and had prescriptions filled at Giant Eagle, according to Giant Eagle's records. However, these 16 customers consisted only of those who had actually transferred their existing prescriptions from Thrift Drugs to Giant Eagle. There is no record of those customers filling new prescriptions at Giant Eagle who would otherwise have filled them at Thrift.

25. Giant Eagle incurred costs of approximately $50,000 in reconfiguring its store to operate a pharmacy department, according to Aetos Construction Company's costs report (Plaintiff's Exhibit 21), and incurred other start-up costs including advertising in preparation of its opening of its pharmacy department.

26. Giant Eagle concedes that most of its costs in connection with opening the pharmacy department were incurred between July 26, 1992, and August 13, 1992, after J.C. Penney had unequivocally asserted its rights under its exclusive. (Giant Eagle Proposed Findings of Fact 23.)

27. Giant Eagle has hired two pharmacists and a pharmacy technician to staff its Quaker Village pharmacy and has stocked its pharmacy department with over $80,000 of merchandise. (Giant Eagle's Proposed Findings of Fact 24, 25.)

28. The Court finds credible testimony at the hearing on the Motion for Preliminary Injunction that pharmacists are in great demand in the Pittsburgh area, and so these employees (presumably at-will employees) should have little trouble obtaining employment elsewhere, or transferring to another Giant Eagle pharmacy. There should be, moreover, little difficulty involved in moving Giant Eagle's Quaker Village stock of drugs to its other pharmacies.

29. Other than the Giant Eagle and Thrift pharmacies, there are no other competing pharmacies within three miles of the Quaker Village Shopping Center. Thrift delivers to customers in the area.

30. Approximately 53% of Thrift's total revenues are generated by annual prescription revenues, and the rest of Thrift's revenue is generated by the sale of cosmetics, non-prescription drugs, tobacco and other products.

31. There has been no evidence that Giant Eagle intentionally or willfully induced Gumberg to breach the exclusive clause of its lease with J.C. Penney and it appears that Giant Eagle's decision to open

the pharmacy department at the shopping center was a unilateral one.

32. There is a strong likelihood that J.C. Penney will succeed at a final hearing on the merits of its Complaint for a permanent injunction to enjoin Giant Eagle from operating a drugstore selling prescription medications at Quaker Village.

33. J.C. Penney is being irreparably harmed by Giant Eagle's disregard of its exclusive pharmacy rights.

34. Giant Eagle will suffer relatively minor harm if the injunction issues, and what harm it will suffer is a result of self-inflicted wounds sustained when it deliberately made a conscious business decision to open a pharmacy at Quaker Village despite the exclusive pharmacy rights that J.C. Penney held and refused to relinquish.

35. The public interest has not been and will not be harmed if Giant Eagle's pharmacy ceases to operate at Quaker Village.

## III. CONCLUSIONS OF LAW

### A. STANDARDS FOR PRELIMINARY INJUNCTION

1. In ruling on a motion for a preliminary injunction, the District Court must consider: (1) the likelihood that the plaintiff will prevail on the merits at a final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *Merchant & Evans, Inc., v. Roosevelt Building Products Company, Inc.*, 963 F.2d 628 (3d Cir. 1992), citing *Opticians Assoc. v. Independent Opticians*, 920 F.2d 187; 191–92 (3d Cir.1990). The injunction should issue only if the plaintiff produces evidence sufficient to convince the District Court that all four factors favor preliminary relief. *Id.*

2. Because all three leases involved in this proceeding are for the lease of premises at Quaker Village in Pennsylvania and involve Giant Eagle's installation and operation of the pharmacy department at that shopping center, and because no other state has a significant interest in this proceeding, Pennsylvania law applies to the interpretation and application of the lease provisions herein. *Zappala v. Hub Foods, Inc.*, 683 F.Supp. 127, 129 (W.D.Pa.1987), citing *Griffith v. United Airlines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964).

### B. PLAINTIFF'S LIKELIHOOD OF SUCCESS ON THE MERITS

3. Pennsylvania follows the modern view which treats landlord-tenant relations in light of principles of contract law, as opposed to property law. *Teodori v. Werner*, 490 Pa. 58, 415 A.2d 31, 33–34 (1980); *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979).

4. Determining the intention of the parties is a paramount consideration in the interpretation of any contract, including leases. The intent of the parties is to be ascertained from the document itself where its terms are clear and unambiguous, and only where an ambiguity exists is parole evidence admissible to explain or clarify the ambiguity, whether that ambiguity is created by the language of the instrument itself or by extrinsic or collateral circumstances. A contract is ambiguous if it is reasonably susceptible of more than one construction and is capable of being understood in more than one sense. Whether an ambiguity exists is a question of law as is the interpretation of the contract. *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 389–90 (1986) (citations omitted).

5. Provisions in a lease specifying the use a tenant will make of the demised premises are covenants against a non-complying use; *i.e.*, no use other than the use specified in the lease is permitted. *Slater v. Pearle Vision Center, Inc.*, 376 Pa.Super. 580, 546 A.2d 676, 677–78 (1988), relying on *Dickey v. Philadelphia Minit-Man Corp.*, 377 Pa. 549, 105 A.2d 580, 581 (1954).

6. It is a general rule of contract interpretation, including the interpretation of restrictive covenants or exclusive use provisions in a lease, that the intention of the parties at the time the contract is en-

tered into governs its interpretation. *Great Atlantic and Pacific Tea Company, Inc., v. Bailey,* 421 Pa. 540, 220 A.2d 1, 2 (1966).

■ 7. Covenants in shopping center leases restricting competition ("exclusives") are presumptively valid in Pennsylvania and enforceable so long as they do not result in an unreasonable restraint of trade, to-wit, so long as the restriction is not greater than required for the protection of the tenant for whose benefit it was imposed and does not cause an undue hardship upon those restricted. *See Bailey,* 220 A.2d at 5 and cases cited therein (Roberts, J., dissenting).[3]

■ 8. While restrictive covenants are presumptively valid and enforceable, they are not favored, and Pennsylvania law requires such restrictive covenants in leases be construed strictly and any ambiguity resolved against the party benefiting from the restrictions against competition. *Carousel Snack Bars of Minnesota, Inc., v. Crown Construction Co.,* 439 F.2d 280, 283 (3d Cir.1971), citing, *inter alia Bailey* ("Every restriction will be construed most strictly against the grantor and every doubt and ambiguity in its language resolved in favor of" permitting the challenged use.) In order to obtain an injunction to enforce a restrictive covenant in a shopping center lease, "the restrictive covenant involved ... must by its *expressed terms* clearly indicate that the parties intended to preclude [another tenant] from selling prescription medications." *Berger v. Ackerman,* 293 Pa.Super. 457, 439 A.2d 200, 202 (1981) (Shopping center lease provided that tenant, "Slanton's Pharmacy," had exclusive right to conduct the "business of drug store in the said shopping center," but that "any sale of drugs by ...

Giant Eagle Market shall in no way conflict with the provisions of this paragraph.") This lease was interpreted to permit Giant Eagle to continue to sell non-prescription drugs as it always had, and additionally to add a pharmacy to its operation for the sale of prescription drugs. The express words of the restrictive covenant in *Berger* did not plainly prohibit Giant Eagle from selling prescription drugs, and so the ambiguity was resolved in its favor.

■ 9. Applying the foregoing principles, the exclusive provisions in both the 1962 Thrift lease and the J.C. Penney 1978 lease have expressly, unambiguously, and continuously since 1962 prohibited the landlord from using or permitting the use of any space at Quaker Valley other than J.C. Penney's, for operation of a drugstore or a drug department in which a registered pharmacist is in attendance, and prohibited Gumberg from entering into any lease that would permit another tenant to make such use of leased premises at Quaker Village during the terms of these leases. The exclusive tenancy provision in the 1978 lease specifically permitted Gumberg's supermarket or variety store tenants, as an incident to their regular businesses, to sell only some

> articles of merchandise customarily sold in drugstores, provided said super market or variety store tenants *shall not compound or sell prescription drugs or sell any merchandise which is limited by federal, state or local law or by regulation of the State Board of Pharmacy to sell in licensed pharmacies.*

The 1962 lease contained substantially similar express language prohibiting any other tenant at Quaker Village from selling prescription medications or from operating a

---

**3.** As it stated at the hearing on the preliminary injunction motion, Giant Eagle does not challenge the exclusive provision of J.C. Penney's lease on antitrust or unreasonable restraint of trade grounds at this juncture, although it reserved the right to raise this argument at a later date. *See generally Harold Friedman, Inc., v. Thorofare Markets, Inc.,* 587 F.2d 127, 144–42 (3d Cir.1978). Such an exclusivity clause, or restrictive covenant, in shopping center leases is occasionally challenged on antitrust grounds,

"implausibly enough, given the competition among malls ..." *Walgreen Co. v. Sara Creek Property Co. (B.V.),* 966 F.2d 273, 274 (7th Cir. 1992). Such an argument might be viewed somewhat skeptically in light of the exclusivity clause that Giant Eagle insisted upon and obtained from Gumberg regarding its operation of a supermarket exclusively for the sale of food and grocery items, with some specific exceptions, at Quaker Village Shopping Center.

registered pharmacy. It is difficult to imagine a more express and explicit covenant restricting the use of leased premises by other tenants, and granting J.C. Penney the *exclusive right to operate such a drugstore at the shopping center.*

10. Moreover, in light of the circumstances that existed in 1977 when Giant Eagle entered into its lease with Gumberg, its use clause did not permit it to sell prescription drugs. This lease provided, "Tenant shall use the demised premises as a food and grocery super market for the sale of items customarily sold in the markets which it operates in the greater Pittsburgh area, including ... a bakery and/or a restaurant minor in nature...." In 1977, Giant Eagle operated no supermarket containing a prescription drugstore. Moreover, at the time that it entered into its lease with Gumberg, Giant Eagle was *at least* constructively *if not actually* aware of the exclusive provision in J.C. Penney's lease, which exclusive continued without interruption pursuant to the 1978 lease between Gumberg and J.C. Penney.[4] That 1978 lease expressly stated that Gumberg agreed no other tenant at Quaker Village had been granted similar rights. (Plaintiff's Exhibit 8, 22.)

11. Based on the foregoing, the Court concludes there is a strong likelihood that plaintiff will succeed on the merits at a final hearing.

## C. IMMEDIATE AND IRREPARABLE HARM TO J.C. PENNEY

12. Breach of an exclusive provision in a shopping center lease may not *necessarily* cause irreparable damage to the tenant protected by such a clause; however, irreparable harm is *almost* inherent in such a situation as Judge Posner has stated.

*Sara Creek,* 966 F.2d at 279 ("injunctions to enforce exclusivity clauses are quite likely to be justifiable by just the considerations present here—damages are difficult to estimate with any accuracy and the injunction is a one-shot remedy requiring no continuing judicial involvement. So there is an argument for making injunctive relief presumptively appropriate in such cases, but we need not decide in this case how strong an argument.") Where a landlord violates the terms of an exclusive provision in a shopping center lease and leases premises to another tenant to use in the manner prohibited by the restrictive covenant with the first tenant, it has been concluded that the first tenant was irreparably harmed because damages for lost profits are difficult to ascertain, because the tenant's good will has been damaged, and because the damage to interests in real estate are generally viewed as unique. *Sara Creek; K-Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915–16 (3d Cir.1989); *Child World, Inc. v. South Towne Centre, Ltd.,* 634 F.Supp. 1121, 1134–35 (S.D.Ohio 1986); *Philip Morris, Inc. v. Pittsburgh Penguins, Inc.,* 589 F.Supp. 912, 920 (W.D.Pa. 1983) ("If plaintiff's advertisement displays are replaced, immediate and irreparable harm will occur. The loss of potential customers who are persuaded by the advertising will be a loss that cannot be calculated in money damages"); *John G. Bryant Co. v. Sling Testing & Repair, Inc.,* 471, Pa. 1, 369 A.2d 1164, 1167 (1977). Moreover, the continuing nature of such a violation of a restrictive covenant in a shopping center lease greatly reduces the efficacy of an award of money damages as a remedy therefor. *John G. Bryant Co.*

13. The Restatement 2d of Property, Landlord and Tenant, Section 7.2, "Land-

**4.** This Court is not persuaded by Giant Eagle's highly technical argument that simply because the 1962 lease was declared to be null and void and of no further force and effect as of October 31, 1978, it was not prohibited in 1977 from entering into a lease permitting it to use premises at the shopping center for the sale of prescription drugs. Giant Eagle offers no legal authority to support this proposition and we again note that there was never a gap in J.C. Penney's exclusive pharmacy rights from 1962 to the present. Even were Giant Eagle correct that in 1977 it was not expressly prohibited from entering into an agreement with Gumberg permitting it to sell prescription drugs at the shopping center, its 1977 lease does not expressly permit such use. The use provision of this lease is therefore ambiguous and, in light of all of the circumstances surrounding execution of the lease in 1977, including the existence of plaintiff's exclusive in its 1962 lease, such use is not permitted by the 1977 lease.

lord's Noncompetition Promise," has been adopted as the law of Pennsylvania in *Teodori v. Werner*, 490 Pa. 58, 415 A.2d 31, 34 (1980). Section 7.2 of the Restatement states:

> Except to the extent the parties to a lease validly agree otherwise, the failure of the landlord to perform a promise contained in the lease that he, or someone holding under him, will not use other property in a manner that will compete with a business of the tenant or of someone holding under the tenant, on the leased property, makes the landlord in default under the lease, if he does not cease, or cause to cease, the competing business within a reasonable time after being requested by the tenant to do so. For that default, the tenant may:
>
> (1) terminate the lease in the manner prescribed ...; or
>
> (2) continue the lease and, if the landlord's promise is valid, obtain appropriate equitable and legal relief ...

Comment (b) to Section 7.2 further provides that the "mere presence in a lease of a noncompetition promise by the landlord justifies the conclusion that it is essential that the promise be observed if the tenant is to conduct his business on the leased property profitably." *See Teodori*, 415 A.2d at 34 ("It is obvious that a landlord's non-competition promise is critical to a commercial lease agreement like the one here," citing Section 7.2, Comment (b) of the Restatement.)

13. As of August 27, 1992, Giant Eagle could identify 16 customers that had switched from J.C. Penney to fill their prescriptions. Giant Eagle submits that J.C. Penney's monetary damages can be readily calculated since all the relevant information about these and similar customers will be recorded and preserved and that, therefore, money damages will be adequate to compensate J.C. Penney for its injuries. However, this is not a complete picture of the damages that J.C. Penney incurs and there is no way to accurately measure what new customers might have gone to Thrift to have their prescriptions filled or how extensive lost profits from non-prescription drug items sold at Thrift to its prescription medication customers might have been.

14. Because damages here are difficult to monetize, because of the continuing nature of the breach of J.C. Penney's exclusive pharmacy rights clause, because of J.C. Penney's loss of good will and the inherent nature and value of an exclusive provision in a shopping center lease, this Court concludes that the injuries to plaintiff are immediate and irreparable.

### D. NEGLIGIBLE HARM TO DEFENDANT

15. If an injunction is granted, the defendant may have to transfer or lay off its two pharmacists and one pharmacy technician, although, with pharmacists in demand and with 88 out of 131 Giant Eagle stores in the greater Pittsburgh area operating with pharmacy departments, Giant Eagle's Proposed Finding of Fact 12, Giant Eagle could likely transfer these employees to another pharmacy. Giant Eagle will also be forced to move its $80,000 of drug inventory, some of which is perishable, to other stores. This should not prove to be too difficult, however, and at worst may be regarded as an inconvenience.

16. Moreover, Giant Eagle may incur construction costs in reconstructing its Quaker Village store.

17. Where a tenant of the landlord at a shopping center knowingly violates an exclusive use provision in another tenant's lease, and knows that the holder of the exclusive refuses to relinquish its rights voluntarily, the subsequent tenant's wounds are self-inflicted, and will not garner much judicial sympathy. *See Opticians*, 920 F.2d at 197 (The defendant can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself); *K–Mart*, 875 F.2d at 916 ("After all, [defendant's] wound, deep as it appears, was self-inflicted.")

18. Any harm that might accrue to defendants by the granting of the Motion for Preliminary Injunction, being self-inflicted and in disregard of the plaintiff's persistent refusal to waive its exclusive pharma-

cy rights, does not approach the harm that would befall the plaintiff if the preliminary injunction is withheld. Rather, as Judge Posner observed in *Sara Creek*, the relative harms to the business entities involved in such circumstances can best be resolved and remedied by prudent business men and women in the commercial marketplace who are best able to value the costs of breaches of contracts and the like, and to establish the cost of doing business. 966 F.2d at 274–75.

### E. THE PUBLIC INTEREST

19. In Pennsylvania, there is no public policy against enforcement of restrictive covenants in a shopping center lease. *See Teodori*, 415 A.2d at 34–35, n. 5 (parties are entitled to a degree of freedom in contracting to protect their economic interests, and controlled development of a shopping center may be desirable); *Sun Drug Co. v. West Penn Realty Co.*, 439 Pa. 452, 268 A.2d 781, 782, 786 (1970) (such covenants are valid if reasonable, *i.e.*, limited in scope, space and time to the extent required to protect the party benefitted by the exclusive.)

20. Congress has explicitly recognized the desirability of such clauses in the bankruptcy area, as the United States Court of Appeals for the Third Circuit has recognized:

Congress has suggested that the modification of a contracting party's rights is not to be taken lightly. Rather, a bankruptcy court in authorizing assumptions and assignment of unexpired leases must be sensitive to the rights of the non-debtor contracting party ... and the policy requiring that the non-debtor receive the full benefit of his or her bargain.... Congress' solicitous attitudes toward shopping centers is reflected in the legislative history regarding [U.S.C.] § 365(b)(3), which states:

A shopping center is often a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit, often subject to a master lease or financing agreement. Under these agreements, the tenant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center ... Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as ... whether the business proposed to be conducted would result in a breach of other clauses in master agreements relating, for example to tenant mix and location. H.R.Rep. No. 595, 95th Cong., 1st Session 348–49, *reprinted* in 1978 U.S.Code Cong. & Admin.News, 5963, 6305; *see also* S.R. Rep. No. 95–989, *reprinted* in *id.* at 5787, 5845.

*In re: Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir.1990).

21. There is a strong public interest in fair dealing between businesses and the solemnity of contracts; if commerce is to function smoothly, "entrepreneurs must play by the rules." *K–Mart*, 875 F.2d at 916.

22. The procompetitive effects of exclusives/restrictive covenants in shopping center leases have been viewed as outweighing any anticompetitive effects that may accompany such provisions. *Walgreen*, 966 F.2d at 274; *Net Realty Holding Trust v. Franconia Properties, Inc.*, 544 F.Supp. 759 (E.D.Va.1982).

23. While Giant Eagle asserts that J.C. Penney's restrictive covenant granting it exclusive pharmacy rights at Quaker Village is against the public interest, its claim is undercut by the fact that it seeks "food and grocery" exclusives in its own shopping center leases, and in fact, obtained one in its lease for premises at Quaker Village.

24. The public interest will not be disserved by enforcing plaintiff's exclusive pharmacy rights at Quaker Village.

### F. LACHES

25. Giant Eagle claims that J.C. Penney delayed unreasonably in asserting its rights and stood idly by while it remodeled its Quaker Village store to install a pharmacy department. This argument is with-

out merit. When a plaintiff brings suit within the statute of limitations, the burden is on defendant to establish the affirmative defense of laches by showing that plaintiff's delay in bringing suit was unreasonable and that defendant was prejudiced thereby. *K–Mart*, 875 F.2d at 911. Giant Eagle cannot meet this burden here because it knew *before* it ever began construction that J.C. Penney held the exclusive pharmacy rights *and* refused to give them up, and because J.C. Penney in fact notified Giant Eagle no later than July 10, 1992, that it held an exclusive and reserved its rights to enforce it. According to Giant Eagle, most of its costs of opening its pharmacy department occurred after July 26, 1992. Plaintiff did not unreasonably delay in asserting its exclusive rights and defendants suffered no prejudice by the timing of the assertion of those rights.

## IV. CONCLUSION

For all of the foregoing reasons, J.C. Penney's Motion for a Preliminary Injunction is granted and Giant Eagle is ordered and directed immediately to cease its operation of a pharmacy department or to otherwise compound or sell prescription drugs at its Quaker Village Shopping Center store. J.C. Penney is directed to post security as required by Fed.R.Civ.P. 65(c) in the amount of $50,000.[5]

## ORDER OF COURT

AND NOW, this 16th day of September, 1992, it is hereby

ORDERED that the Motion of J.C. Penney Company for Preliminary Injunction (Document No. 4) is GRANTED.

IT IS FURTHER ORDERED that defendants, Giant Eagle, Inc., and Giant Eagle Markets, Inc., shall immediately cease to operate a pharmacy department or to otherwise compound or sell prescription drugs at its Quaker Village Shopping Center store;

IT IS FURTHER ORDERED that defendant, Stanley R. Gumberg, shall refrain

from leasing any space at the Quaker Village Shopping Center to tenants to use in violation of J.C. Penney's exclusive pharmacy rights, and is directed to take all reasonable steps to enforce those rights in the event any tenant attempts to operate a drugstore for the sale of prescription drugs or otherwise violate the exclusive pharmacy clause;

IT IS FURTHER ORDERED that plaintiff, J.C. Penney Company, Inc., shall post security as required by Fed.R.Civ.P. 65(c) in the amount of Fifty Thousand ($50,000) Dollars.

THIS ORDER shall be binding upon the parties to this action, their officers, agents, servants, employees, attorneys and any and all other persons acting in concert or participating with those who receive actual notice of this Order.

---

5. It is unnecessary to address and resolve the issue whether Giant Eagle has intentionally interfered with a contractual relationship between

Gumberg and J.C. Penney, and this Court expresses no opinion on that issue.