**TIME WARNER CABLE OF NEW YORK CITY, A DIVISION OF TIME WARNER ENTERTAINMENT COMPANY, L.P.; Paragon Communications, d/b/a Time Warner Cable of New York City; Queens Inner Unity Cable Systems, d/b/a Quics, and TWC Cable Partners, d/b/a Staten Island Cable, Plaintiffs–Appellees,**

v.

**BLOOMBERG L.P., Defendant–Intervenor–Appellant,**

**City of New York, Defendant–Appellant.**

**Nos. 1428, 1429, Dockets 96–9515, 96–9517.**

United States Court of Appeals, Second Circuit.

Argued Feb. 19, 1997.

Decided July 3, 1997.

Elizabeth I. Freedman, New York City (Paul A. Crotty, N.Y. City Corporation Counsel, Leonard Koerner, Timothy J. O'Shaughnessy, Office of the N.Y. City Corporation Counsel, New York City, on the brief), for defendant-appellant.

Martin Garbus, New York City (Maura J. Wogan, Edward H. Rosenthal, Edward Hernstadt, Frankfurt, Garbus, Klein & Selz, New York City, on the brief), for defendant-intervenor-appellant.

Stuart W. Gold, New York City (Robert D. Joffe, Rory O. Millson, Rowan D. Wilson, Julie A. North, Cravath, Swaine & Moore, New York City, on the brief), for plaintiffs-appellees.

(James N. Horwood, Spiegel & McDiarmid, Washington, DC; Jeffrey S. Hops, Washington, DC, submitted a brief for amicus curiae Alliance for Community Media).

(Floyd Abrams, Landis C. Best, Cahill Gordon & Reindel, New York City, submitted a brief for amici curiae Mark Green, Ruth Messinger, and Fernando Ferrer).

(Arthur H. Harding, R. Bruce Beckner, Jill Kleppe McClelland, Fleischman and Walsh, Washington, DC, submitted a brief for amicus curiae National Cable Television Association, Inc.).

(Arthur N. Eisenberg, New York City, submitted a brief for amicus curiae New York Civil Liberties Union).

(Clifford Thau, Squadron, Ellenoff, Plesent & Sheinfeld, New York City; Yosef J. Riemer, Kirkland & Ellis, New York City; Richard Cordray, Paul D. Clement, Eric R. Claeys, Kirkland & Ellis, Washington, DC, submitted a brief for amicus curiae Fox News Network).

(Robert T. Perry, Thomas J. Sinnickson, Brooklyn, NY, submitted a brief for amicus curiae Media Access New York).

(Yvonne S. Quinn, Jacqueline Bryks, Sullivan & Cromwell, New York City, submitted a brief for amicus curiae Cablevision of New York City).

Before: NEWMAN, KEARSE and FRIEDMAN,* Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the use of channels on a cable television system. The ultimate issue is whether a cable system operator may prevent a city from placing on channels reserved to the city for educational or governmental purposes a 24-hour general news service and a 24-hour business news service, both produced by commercial television programmers. The issue arises on an appeal from the November 6, 1996, order of the United States District Court for the Southern District of New York (Denise L. Cote, Judge) granting the motion of Plaintiffs, including Time Warner Cable of New York City, for a preliminary injunction to prevent New York City ("the City") from using channels reserved for educational or governmental purposes to carry the 24-hour programming service of Fox News or Bloomberg Informational Television. *Time Warner Cable of New York City v. City of New York,* 943 F.Supp. 1357 (S.D.N.Y.1996) ("*Time Warner I*"). The injunction was grounded primarily on the Court's view that Plaintiffs were likely to succeed on their claim that the City's proposed use of the channels violated Plaintiffs' First Amendment rights.

Without adjudicating the First Amendment issue, we conclude that Plaintiffs have shown a probability of success on their claim that the City's proposed use of educational and governmental channels would violate the franchise agreements between the City and

---

* The Honorable Daniel M. Friedman of the United States Court of Appeals for the Federal Circuit, sitting by designation.

Plaintiffs, and that the District Court did not exceed its discretion in concluding that a preliminary injunction was needed to prevent irreparable injury.

## Background

Understanding the issues requires some consideration of the pertinent provisions of the Cable Communications Policy Act of 1984 ("the Cable Act"), Pub.L. No. 98–549, 98 Stat. 2779, 47 U.S.C. § 521 *et seq.*, as well as the facts of this case.

### A. The Cable Act

A "cable operator" is an entity that transmits programming over a cable system and owns or controls the facilities or equipment—the system—used for such transmissions. 47 U.S.C. §§ 522(5)-(7) (1994). Plaintiffs, Time Warner Cable of New York City, Paragon Communications, Queens Inner Unity Cable Systems, and TWC Cable Partners (collectively, "Time Warner") are cable operators serving Manhattan, Brooklyn, Queens, and Staten Island. Under agreements similar to those that bind most, if not all, cable operators in the nation, Time Warner owns its cable systems and operates them subject to franchise agreements between the City, as franchisor, and Time Warner, as franchisee.[1]

### B. Time Warner's Cable System

The Cable Act provides statutory authority for governmental entities, such as the City, to require cable operators to enter franchise agreements governing the operation of their cable systems, and to require the operators' compliance with the Act's national standards for the provision of cable television services. *See* 47 U.S.C. § 521. One of those national standards authorizes the franchisor to require the cable operator to set aside some channel capacity for the franchisor to use or assign for the transmission of what the Act labels "public, educational, or governmental use." 47 U.S.C. § 531(b). Such use is known as "PEG" programming.

There are nine PEG channels in Manhattan, and a total of nine more covering the rest of the City. Time Warner's cable system consists of seventy-seven channels in Manhattan, and seventy-six covering the other boroughs it serves. Under Time–Warner's franchise agreements with the City, nine of the seventy-seven Manhattan channels are reserved for PEG programming, as are nine of the seventy-six channels in the other boroughs.[2] Of the nine channels allotted to the City for PEG use in all boroughs, five are designated for educational or governmental ("EG") use, and are administered by the City itself on what is known as the "Crosswalks Network." The four public ("P") channels are administered by the Manhattan Neighborhood Network as public access channels and are not at issue in this case.

### C. The Franchise Agreements

In 1983, Time Warner and the City entered into a Franchise Agreement (the "1983 Agreement") whereby the City permitted Time Warner to lay cable equipment and to provide cable services in Brooklyn, Queens, and Staten Island. That Agreement remains in effect today, as does a similar agreement (the "1990 Agreement") covering the northern and southern portions of Manhattan.

Both Agreements provide for PEG channels to be reserved for use by the City. The two Agreements, however, do not use the same language to define the scope of proper use of those PEG channels. Section 4.1.03 of the 1983 Agreement refers to the PEG channels as "Municipal Channels," which may be used "for the purpose of distributing non-commercial Services by the City or for any other lawful, governmental purpose...."

---

1. A franchisor is empowered by law to grant a franchise, or license, for the construction of a cable system within the jurisdiction of the franchisor's authority. 47 U.S.C. §§ 522(10), (9).

2. In addition to the channels set aside for PEG use, eleven channels are set aside for leased access, *see* 47 U.S.C. § 532, plus fifteen of the Manhattan and Staten Island channels are subject to the must-carry rules, *see id.* § 534, as are fourteen of the Brooklyn and Queens channels. The net effect is that Time Warner has control over forty-one or forty-three of its seventy-seven or seventy-six channels, depending on the borough.

The corresponding provision in the 1990 Agreement provides:

> The Governmental Channels shall be … used for distributing Services by the City or educational institutions for functions or projects related to governmental or educational purposes, including the generation of revenues by activities reasonably related to such uses and purposes.

1990 Agreement § 4.1.04. The City retained the right under both Agreements to approve in advance any "change in control" of the franchisees, with "control" defined as "actual working control." *See* 1990 Agreement §§ 11.2, 1.20; 1983 Agreement §§ 14.1, 1.15.

### Facts

In late September 1995, Time Warner, Inc. (the corporate parent of the franchisees) publicly announced that it intended to merge with Turner Broadcasting System, Inc. Eight months later, on May 30, 1996, Richard Aurelio, President of Time Warner Cable of New York City, wrote a letter notifying the City of the planned merger and explaining that Time Warner did not consider the merger a change of control under the Franchise Agreements, and therefore that the City's consent to the merger would not be necessary.[3] After a meeting, the City's Department of Information Technology and Telecommunications ("DoITT"), which is the City agency charged with administering the use of Crosswalks, directed Time Warner to submit a formal petition for an official determination that Time Warner's merger was not a change of control.[4] On July 22, 1996, Time Warner submitted its formal petition, and included a request that the City resolve the issues by August, since it was expected that the merger would close in September. By late July,

DoITT had informed Time Warner that the City considered the merger to be a change of control, but that "we believe that it may be possible for DoITT to recommend approval of the merger," and that efforts would be made to do so within the requested time frame.

During the same period, negotiations were ongoing between Time Warner and MSNBC, a joint venture between NBC and Microsoft, as well as between Time Warner and Fox News, a network to be distributed by News Corporation. MSNBC and Fox had both announced plans to begin a 24–hour news service for cable. Time Warner's carriage of either one of these news networks on its cable systems would facilitate its compliance with a Federal Trade Commission ("FTC") consent order that sought to resolve the potential anticompetitive effects of the merger.[5]

Time Warner ultimately chose MSNBC over Fox to provide the unaffiliated news programming required by the consent order. On September 17, Time Warner notified Rupert Murdoch, CEO of News Corporation, of that decision.

A few days after Murdoch learned that his company had lost the bidding war to MSNBC, Roger Ailes, Fox's President and a former media advisor to the Mayor of New York City, informed the Mayor that Fox had been unable to secure access to Time Warner's cable system. Approximately two weeks later, at a meeting involving Time Warner and various City representatives, including the FCRC Chair, Deputy Mayor Reiter suggested to Time Warner that the City might use Crosswalks to enable Time Warner to provide a channel for Fox News. Believing Time Warner's decision not to car-

---

3. Previously, the City had consistently taken the position that even a restructuring of a franchisee was a change of control. Nonetheless, the City had always consented to planned changes of control, albeit with the imposition of certain conditions.

4. The Franchise and Concession Review Committee ("FCRC") oversees the City's franchise matters. New York City Charter, ch. 14 § 373. The Mayor directly controls two of its four seats, *id.* § 373(a), and indirectly controls another two, which are held, one each, by the Office of Management and Budget, and the Corporation Coun-

sel, *id.* The two remaining seats are held by representatives of the particular borough involved in the franchise at issue. *Id.* The FCRC is the agency that decides whether to consent to a change of control over a franchisee.

5. The consent order required Time Warner, among other things, to make an additional unaffiliated news service available to one half of Time Warner's cable subscribers, nationwide, by the year 2001. The full Commission initially approved the consent order on September 12, 1996.

ry Fox News to be the result of limited channel capacity, Reiter offered to make a Crosswalks channel available for the arguably "educational" programming carried on one of Time Warner's commercial channels, such as the Discovery Channel, thereby freeing one of Time Warner's commercial channels for transmission of Fox News. Time Warner refused the proposed arrangement, and indicated that the City's request might violate the Cable Act.

The following day, Reiter wrote to Time Warner requesting some type of "waiver" to permit the City to carry Fox News on a Crosswalks ("E" or "G") channel, a step alleged to increase job opportunities in New York and promote a diversity of news programs. On October 3, Time Warner rejected this new proposal.

At an FCRC meeting on October 9, a representative of the Mayor advised the FCRC that the City had not yet considered the issues relating to Time Warner's merger, and that DoITT was not yet prepared to recommend the merger. This statement was somewhat contrary to DoITT's indication in late July that it would seek to make a timely recommendation to the FCRC.

That same day, the City made a final proposal to Time Warner. This time, the City asked Time Warner to "consent" to the City's transmission of Fox News, including its commercials, on Crosswalks. The proposal went further, however, and also asked for Time Warner's consent for the City to transmit on a Crosswalks channel, in addition to Fox News, Bloomberg Information Television ("BIT"), primarily a financial news service produced by Bloomberg, L.P. The City's proposal indicated that if Time Warner withheld consent, the City would air Fox News and BIT without consent but without commercials. Time Warner again refused the City's request, noting that the removal of commercials would not, in its opinion, remove the commercial nature of the news programs, and that the City's actions potentially violated Time Warner's First Amendment editorial discretion over the use of its own channels.

Realizing at this point that Time Warner had resolved to make its own decisions regarding the programming to be carried on non-PEG channels, and that Time Warner would not consent to what it considered would be an impermissible use of the PEG channels, the City decided on October 10, 1996, to begin transmitting BIT on Crosswalks *without* Time Warner's consent, and *with* commercials. Although the City also planned to begin similar transmission of Fox News the following day, that was prevented by the filing of the instant lawsuit and the issuance of a TRO.

### Proceedings in the District Court

On October 11, 1996, Time Warner moved for a temporary restraining order and a preliminary injunction, seeking to stop the City from using Crosswalks to carry BIT, which had aired for a few hours, and to prevent use of Crosswalks to carry Fox News. The District Court granted the TRO and scheduled the preliminary injunction hearing for October 23, 1996. Bloomberg, initially not a party to the action, intervened.

After hearing evidence, Judge Cote found that after the Mayor learned that Time Warner had denied Fox News access to its cable system, the City's actions, including the three proposals, the stalling of FCRC approval, and finally the placing of BIT on a Crosswalks channel, were all taken for the purposes of coercing Time Warner to reconsider its denial of a channel for Fox News and retaliating against it for having denied Fox News access in the first place.

Having reached those preliminary conclusions as to the City's motives, Judge Cote proceeded to consider whether there was a basis for granting the preliminary relief Time Warner requested. After determining that the injunction could issue only on a showing of a substantial likelihood of success on the merits of the dispute, Judge Cote held that Time Warner had demonstrated that the City's actions (i) violated the broad purposes of PEG channels and of the structure of the Cable Act, (ii) violated the governmental use provision of the Act, (iii) violated the franchise agreements, (iv) violated the Act's provision protecting the cable operator's editorial discretion, and (v) violated Time Warner's First Amendment rights.

On the basis of the last two of these violations, as to which Judge Cote determined Time Warner had demonstrated both a substantial likelihood of success on the merits and irreparable harm, Judge Cote preliminarily enjoined the City from transmitting either BIT or Fox News on a Crosswalks channel.

For the reasons that follow, we affirm the preliminary injunction, though on different grounds.

### Discussion

#### I. Injunction Standard

 The first issue in this case concerns the standard for granting a preliminary injunction.[6] That standard is normally a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Bloomberg and the City rely on the line of cases holding that the movant may satisfy the second prong of the preliminary injunction test only by meeting the higher "likelihood of success" standard if it seeks to stay "governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *See Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir. 1989). Although Time Warner claims to have met this higher standard, it urges that the lower "serious questions" standard is more appropriate for this case and that it was error for the District Court to use the higher standard. The distinction between the two standards might well be significant in this case since Time Warner's claims on the merits present somewhat close questions.

This Circuit has offered differing views on the appropriate standard for issuance of a preliminary injunction against governmental action. We have sometimes required a strong showing of entitlement to a prelimi-

nary injunction against governmental action, *see, e.g., International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 70 (2d Cir.1996); *NAACP v. Town of East Haven,* 70 F.3d 219, 223 (2d Cir.1995); *Plaza Health Laboratories,* 878 F.2d at 580; *Union Carbide Agricultural Products Co. v. Costle,* 632 F.2d 1014, 1018 (2d Cir.1980); *Medical Society of State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977), at least where the injunction stays "governmental action taken in the public interest pursuant to a statutory ... scheme," *International Dairy,* 92 F.3d at 70 (internal quotation marks omitted); *NAACP,* 70 F.3d at 223; *Plaza Health Laboratories,* 878 F.2d at 580, or the injunction might "adversely affect the public interest in a manner which cannot be compensated for by an injunction bond," *Medical Society,* 560 F.2d at 538. Judge Friendly expressed the view that the "serious question/balance of hardships" test is not applicable where an injunction is sought against a sovereign. *See Mitchell v. Cuomo,* 748 F.2d 804, 810 (2d Cir.1984) (Friendly, J., dissenting). On the other hand, we have said that the "probability of success" standard "need not always be followed merely because a movant seeks to enjoin government action," *Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1326, 1339 (2d Cir.1992), and we have applied the lesser standard in suits against governmental entities, *e.g., id.; Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 836 F.2d 760, 763 (2d Cir.1988); *Patton v. Dole,* 806 F.2d 24, 30 (2d Cir.1986). As *Haitian Centers* pointed out, in some litigation against the government, "no party has an exclusive claim on the public interest." 969 F.2d at 1339.

In the pending suit, there are public interest concerns on both sides—the claims of the City to be promoting diversity of programming on PEG channels for the public's benefit and the claims of Time–Warner to be protecting the use of PEG channels for their intended, limited public purposes. Moreover, this is not a suit like *Plaza Health Laboratories* or *Medical Society* where the injunction was sought to prevent the exercise

---

6. The standard of review is for an abuse of discretion, which will be found if the trial court made an error of law. *Molloy v. Metropolitan*

*Transportation Authority,* 94 F.3d 808, 811 (2d Cir.1996).

of governmental regulatory authority. Here, the proposed action of the City in deciding what programming to place on one of its reserved PEG channels is more akin to the sort of proprietary action in a federally regulated field that, if undertaken by a state, has sometimes been said to waive the defense of sovereign immunity. *See Parden v. Terminal Ry.*, 377 U.S. 184, 196, 84 S.Ct. 1207, 1215, 12 L.Ed.2d 233 (1964) (state railroad subject to F.E.L.A. liability). We conclude that the lower preliminary injunction standard would be applicable to this litigation. However, because we have some doubt whether the balance of hardships tips decidedly in favor of Time Warner, and we are satisfied that Time Warner has met the higher probability of success standard, we will decide the appeal under the higher standard.

## II. Irreparable Injury

■ Either preliminary injunction standard requires a showing of irreparable injury. In contending that it faces irreparable injury, Time Warner merges its claims of injury with its claims on the merits. Thus, Time Warner contends that placing Fox News and BIT on Crosswalks channels will cause irreparable injury to its rights protected by the First Amendment, the Cable Act, and the Franchise Agreements. Though impairment of First Amendment rights can undoubtedly constitute irreparable injury, *see Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (plurality opinion), we think it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights.

Time Warner alleges that two adverse consequences will flow from placing Fox News and BIT on Crosswalks channels. First, Time Warner will be deprived of control over the mix of programming to be carried on its cable system. Whether or not Time Warner has standing to complain about how the City uses Crosswalks channels and whether or not such use violates any rights of Time Warner, matters we consider below, we think that this aspect of the "injury" Time Warner asserts suffices for purposes of a preliminary injunction. Time Warner is the operator of the cable system. It solicits subscribers based on the total mix of programming carried on the entire cable system, a circumstance that affects its competitive position vis à vis satellite systems and over the air transmissions. Alteration of that programming mix is a use of its cable system in a manner that cannot be satisfactorily remedied after the fact. Even though the selection of programming for the Crosswalks channels is made by the City, it is still Time Warner's cable system that is delivering this programming into its subscribers' homes. Requiring Time Warner to carry programming the placement of which on a Crosswalks channel might be unlawful is an adverse consequence that satisfies the test of irreparable injury.

Time Warner's second claim of injury is less persuasive. It apprehends pressure on its decision-making authority with respect to its choice of programming on the non-PEG channels of its cable system. It fears that if Fox News (and, to a lesser extent, BIT) is carried on Crosswalks channels, such programming will capture an audience some of whom will exert pressure on Time Warner to continue this programming on its non-PEG channels after the City later withdraws the programming from Crosswalks channels.

There is something anomalous about a media conglomerate like Time Warner seeking judicial relief to ward off the pressures that might be generated by consumer preferences. But even if such concerns might entitle Time Warner to seek relief, they are entirely too speculative on this record to establish the irreparable injury that a preliminary injunction serves to avoid. It is speculative whether and when the City might remove Fox News and BIT from Crosswalks channels, whether such programming will by then have attracted a substantial audience, and whether any significant portion of such audience would then clamor to have this programming continued on Time Warner's non-PEG channels.

Without assessing the District Court's ruling that Time Warner will suffer irreparable injury to its First Amendment rights, we

conclude that the plaintiff has shown sufficient irreparable injury for purposes of a preliminary injunction, simply by having the mix of programming carried on its cable system altered in ways that could not be adequately remedied after the fact.

## III. Probability of Success

### A. First Amendment

With respect to the merits, the District Court grounded its injunction primarily, if not entirely, on Time Warner's claim of a First Amendment violation. We are less certain than the District Court that the City's action in making PEG channels available for Fox News or Bloomberg programming constitutes the type of governmental action that violates the First Amendment. Indeed, such action seems more within the concept of government as speaker than government as regulator. *See* Mark G. Yudof, *When Government Speaks: Politics, Law, and Government Expression in America* (1983); Steven Shiffrin, *Government Speech,* 27 UCLA L.Rev. 565 (1980); Edward H. Zeigler, Jr., *Government Speech and the Constitution: The Limits of Official Partisanship,* 21 B.C. L.Rev. 578 (1980). If the Mayor were to repeatedly urge New Yorkers to bombard Time Warner with demands to carry Fox News or BIT on Time Warner's non-PEG channels, it is doubtful that such urging would encounter First Amendment limitations. Placing programming on a channel reserved for city use is not just speech (whatever First Amendment rights the City itself might have in selecting programming for PEG channels free of court restraint), but it is a far cry from the sort of governmental regulation at issue in the cases collected by Time Warner to support the proposition that "[t]he First Amendment prohibits the government from imposing economic burdens and engaging in a wide variety of conduct that is intended to encourage or discourage speech because of its content or viewpoint." Brief for Appellees at 67 & n. 108. The six cited cases all involved specific governmental regulation, such as taxation, *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), restricting expenditures for political purposes, *Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), imposing requirements and limitations on charitable solicitations, *Riley v. National Federation of the Blind of North Carolina, Inc.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), or restricting receipt of income from writings, *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991).[7] Time Warner contends that the City attempted to place Fox News on a PEG channel out of political motivation—to punish Time Warner and to reward Rupert Murdoch. But not every act of government motivated by political considerations is activity restricted by the First Amendment. Indeed, most governmental actions are motivated by political considerations, including selection of appointees and enactment of legislation.

Whether placing programming on a PEG channel is the sort of governmental action that is subject to First Amendment restriction is a close question,[8] and, since it is a

7. "In an open society like our own, acts of disapproval by public authorities, unaccompanied by any imposed or threatened sanctions, will generally not create sufficient risk of suppressing ideas to warrant judicial intervention." *Pico v. Board of Education, Island Trees Union Free School District No. 26,* 638 F.2d 404, 433 (2d Cir.1980) (Newman, J., concurring), *aff'd,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982).

8. The closeness of the issue is illuminated by the various views that have been expressed in another context where governmental action that fell short of imposing sanctions or traditional regulatory restraints was challenged on First Amendment grounds—school library book removal. *Compare Board of Education, Island Trees Union Free School District No. 26 v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion) *with id.* at 885, 102 S.Ct. at 2817 (dissenting opinion). Though the plurality opinion in *Island Trees* applied First Amendment limitations to library book removal, it distinguished such action from a governmental decision to acquire a book, *id.* at 871–72, 102 S.Ct. at 2810–11, an action that is not entirely dissimilar, though not precisely analogous, to selecting programming for a PEG channel.

constitutional question, we think it preferable to follow the usual course of considering first the non-constitutional claims at issue, claims that in this case suffice to support the order on appeal.

### B. Breach of the Franchise Agreements

■ The 1983 Franchise Agreement provides that the "Municipal Channels" would be used "for the purpose of distributing non-commercial Services by the City or for any other lawful, governmental purpose." The City argues that word "other" can only mean "other than noncommercial." Thus, under the City's reading, the City could air any "other than noncommercial" (*i.e.*, commercial) programming, if otherwise lawful.

The 1990 Agreement provides that the "Governmental Channels" would be used "for distributing Services by the City or educational institutions for functions or projects related to governmental or educational purposes, including the generation of revenues by activities reasonably related to such uses and purposes." Time Warner contends that the language of all the Agreements conveys the understanding that the City would be allowed to air only noncommercial programming.

Both agreements pose difficult issues of interpretation, not the least of which arises from the fact that neither agreement defines "commercial." The word could refer to programming accompanied by "commercials," *i.e.*, paid advertisements for products or services. Or it could refer to programming with a "commercial" purpose, *i.e.*, to make money for the companies that produce the programming and offer it for sale to cable systems. Or it could refer, somewhat more narrowly, to programming offered for sale to cable systems only by for-profit producing companies. The text of the agreements does not select from among these or other possible meanings, nor does it indicate whether it is intended to cover programming that normal-ly satisfies whatever definition is selected, but omits a typical characteristic. For example, BIT might generally be regarded as "commercial" programming because it is produced by a for-profit company, offered for sale to cable systems, and normally aired with commercials, but not in this case because Bloomberg has offered to place BIT on a Crosswalks channel without charge and without commercials.

Though the meaning of "commercial" in these agreements is not clear, we think the District Court proceeded correctly, at least at this preliminary stage of the litigation, by concluding that whatever the Agreements mean, they do not authorize the City to use Crosswalks for programming beyond the categories of "educational" and "governmental" as those terms are used in the Act. And the Court was also entitled to conclude, at this stage of the litigation, that Fox News and BIT were not within these categories, even if in some circumstances "E" or "G" channels may properly be used for programming that is in some sense "commercial."

The Agreements were drafted to implement the City's authority, expressly conveyed by the Act, to require Time Warner to reserve channels for PEG use. Congress illustrated the scope of "E" and "G" channels in the following terms: "Educational access allows local schools to supplement classroom learning and to reach out to teach those who are beyond school age or unable to attend classes. The governmental channel allows for a local 'mini-C-SPAN'...." [9] S.Rep. No. 102–92, at 52–53 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1185–86. Though these examples do not necessarily define the limits of "E" and "G" categories, they indicate the general nature of the programming that Congress expected would be carried on the channels it was requiring cable operators to reserve for use by franchising authorities.

---

9. The 1984 House Report has the following passage:

> ["P"] channels ... provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas. PEG channels also contribute to an informed citizenry by bringing local schools into the home and *by showing the public local government at work.* [The Act] allow[s] cities to specify ... that channel capacity ... be devoted to such use.

H.R. Rep. No. 98–934, at 30 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4667 (emphasis added).

Congress also made clear that, contrary to the City's contention, a "G" channel is not available for any use that the City wishes to make of it. Not only did Congress indicate what it generally contemplated would appear on PEG channels, but it also indicated that it would be inappropriate for the franchising authority to treat PEG channels as commodities to be traded to the highest bidder: "[T]he Committee does not intend that franchising authorities lease governmental channels *to third parties for uses unrelated to the provision of governmental access.*" H.R. Rep. No. 98–934, at 47 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4684 (emphasis added).

■■ Read in light of Congress's general purposes in authorizing PEG channels, it is apparent that the language of the 1990 Agreement does not contemplate a broad authorization to air commercial programming; rather, it allows the City to air programming that is "related to governmental or educational purposes." Though the terms "governmental" and "educational" need not be construed so narrowly as to preclude inventive new uses of channels reserved for a city's use, neither can they be stretched, as the City contends, in a manner that deprives them of any restrictive meaning. "Educational," though not necessarily limited to traditional course instruction, cannot be so limitless as to include any program that has any conceivable educational value. Similarly, "governmental," though not necessarily limited to the televising of a public hearing, cannot be so limitless as to include any programming selected by a governmental unit. If Congress wishes to permit franchising authorities to insist on channels allotted for such limitless purposes and if franchise agreements purport to implement authority thought to be that broad, both the statute and the agreements must use language reasonably conveying such meaning.

The City's conduct up to the time of this lawsuit reflects the fact that it did not believe that it had the authority to consider any and all programming to be within the "E" or "G" categories. The City tried to convince Time Warner to grant a waiver of the franchise agreements' restrictions so that Fox could be carried on Crosswalks. Whatever the words

"educational" or "governmental" mean in the context of PEG channels and the Franchise Agreements, the City obviously thought that Fox and BIT did not fit the description. The City's mission statement for Crosswalks states that its purposes and goals are "to provide educational programming and to enhance public awareness of government activities and services through its five basic cable channels via strictly non-commercial and non-partisan television." The 1992 Programming Policy and Operational Procedures for Crosswalks, reaffirmed in 1995, stated that the goals were (1) to "enhance public awareness and understanding of the structure and functions of City government services, resources, and activities," (2) to "increase access to City government for the City's residential and business communities," (3) to "provide various educational services to the City's diverse communities," and (4) to "disseminate information about the services and programs provided by City agencies and other government offices."

When the City launched Crosswalks in 1992, the Commissioner of the City's Department of Telecommunications and Energy, William F. Squadron, outlined its uses in these words:

> [Crosswalks would have] programs devoted to enhancing the quality of life for young people and for senior citizens. It will have job training shows and employment listings. It will offer public safety tips on subjects like crime and fire prevention. It will provide health information to help people identify and respond to illness. It will display a bulletin board of government, educational, and cultural activities throughout New York. And, in time, it will cablecast the proceedings of the City Council and the City Planning Commission.

*Time Warner I,* 943 F.Supp. at 1373 (quoting Commissioner Squadron's Statement). He also stated that Crosswalks was "not a commercial enterprise." *Id.*

On this appeal from a preliminary injunction, we need not decide what renders programming "commercial" for purposes of the franchise agreements or whether programming is always precluded from PEG chan-

nels solely because of its commercial nature. Judge Cote was careful to point out that she was "not determining whether a government can ever run 'commercial' programming on a PEG station," and she explicitly did "not find that the Cable Act bans advertising on PEG stations." *Id.* at 1387. The appellants have called to our attention instances where commercial advertisements have been aired on PEG channels that carry programming of a traditional educational or governmental nature. They have also cited the situation in Aurora, Colorado, where a PEG channel was used to air news programming that is "commercial" in the broader sense that it is regularly marketed for airing on non-PEG channels. Without attempting to draw a definitive line, we observe that the Aurora example, if a proper use of a PEG channel, would demonstrate the special circumstance of placing local news programming on a PEG channel in a market not otherwise served by traditional local news programming, rather than a general authorization to place commercial programming on a PEG channel, regardless of the special circumstances that might make such placement permissible.[10]

■ Appellants contend that, to the extent that the Court's order purports to enforce the limitations of the Franchise Agreements, the order enables Time Warner to violate section 531(e), which provides that a cable operator may not "exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section." The City understandably emphasizes the prohibition against "editorial control." However, the subsection prohibits editorial control "over any public, educational, or governmental use" of allotted channels.[11] This bars the operator from attempting to determine the content of programming that is within the PEG categories. However, it cannot mean that the operator is barred from enforcing the contractual limitations of the agreements whereby the City is allotted PEG channels. Congress could not have authorized cities to require cable system operators to allot PEG channels to them and at the same time have left the cities free to use these allotted channels for purposes beyond the scope of PEG purposes. Section 531 does not permit the cities to require allotment of channels for any purpose the cities might desire. It permits a requirement only for PEG channels. Having established the required category, Congress must have expected that the contracting party would be able to make sure that a city was not exceeding the scope of what Congress permitted a city to require.

Of course, as to programming *within* the PEG categories, section 531(e) prohibits the cable operator from exercising any "editorial control," and courts enforcing the outer limits of PEG categories must be alert not to permit a cable operator to bar disfavored programming under the guise of enforcing such limits. However, just as the Postal

---

10. Appellants also call our attention to the placement on "G" channels in various jurisdictions of advertisement-supported programming produced by Kaleidoscope, a for-profit company that develops specialized programming for people with disabilities. The fact that such programming is carried on "G" channels does not necessarily mean that it would be determined to fall within the "G" category if any cable system operator objected. In any event, the determination as to a permissible use of a "G" channel would likely depend on the precise nature of the programming being offered and whether the placement of the programming on a "G" channel meets a community need not otherwise being satisfied. In this litigation, we consider only the placement of Fox News and BIT on a "G" or "E" channel in the New York City television market.

11. Two Justices of the Supreme Court have stated that section 531(e) prohibits cable operators from exercising "any editorial control over PEG access *channels.*" *See Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.,* — U.S. ——, ——, 116 S.Ct. 2374, 2408, 135 L.Ed.2d 888 (1996) (Kennedy, J., with whom Ginsburg, J., joins, concurring and dissenting in part) (emphasis added). This rendering of the provision omits the words in section 531(e) that limit the prohibition to editorial control over "any public, educational, or governmental use of channel capacity provided pursuant to [section 531]." The distinction was not significant in *Denver Area,* since no issue was raised as to whether the programming sought to be curtailed was outside the scope of PEG channels. Justice Kennedy's opinion notes that "substantive limits on the types of programming on [PEG] channels . . . [are] left to franchise agreements, so long as the channels comport in some sense with the industry practice to which Congress referred in the statute." *Id.*

Service can determine whether a customer's materials are within the category of mail eligible for third class or other reduced rates without being accused of exercising editorial content over materials within such categories, so cable operators may enforce the boundaries of the categories they are obliged to offer municipalities at no charge without violating section 531(e).

■ Time Warner has shown a probability of success on its claim that the City's attempt to place Fox News and BIT on PEG channels, in a market served by existing general and business news programming,[12] will violate the Franchise Agreements.[13]

## IV. Cable Act Violations

In view of our conclusion concerning the probability of success on the Franchise Agreements claim, we need not consider separately the merits of Time Warner's additional claims that the City's proposed use of PEG channels violates the Cable Act,[14] or the First Amendment.

## V. Entitlement to a Preliminary Injunction

■ Whenever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief. *See Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1480 (6th Cir.1995); *Westlands Water District v. Natural Resources Defense Council*, 43 F.3d 457, 459 (9th Cir.1994); *Virginia Carolina Tools, Inc. v. International Tool*

*Supply, Inc.*, 984 F.2d 113, 119–20 (4th Cir. 1993). Otherwise a claim that appears meritorious at a preliminary stage but is ultimately determined to be unsuccessful will have precipitated court action that might needlessly have injured the public interest.

■ There are public interest concerns on both sides of the pending controversy. The public will benefit if PEG channels are maintained available for their intended use. Even though PEG channel capacity is not currently being fully used by the City, any diversion of these scarce channels from their proper use risks deterring potential users from developing the programming for which these channels were intended. Indeed, it risks deterring the City itself from using "G" channel capacity to serve the principal Congressional purpose of making the operation of government better known to the citizens.

On the other hand, there is a public interest in expanding and diversifying the extent of news and information available to the television viewing audience, and the injunction in this case keeps two reputable TV news and information services off the air.

The interests are not easily weighed. If numbers alone mattered, it is likely that far more New Yorkers would appreciate the opportunity to see Fox News or BIT on a Crosswalks channel than would be disappointed by some diminution in the typical fare on these channels. But numbers cannot be decisive. Congress authorized PEG channels to serve important interests. Indeed, it is precisely because much of PEG programming has a limited, often specialized audience whose needs are not otherwise met that

---

**12.** The Time Warner cable system currently carries N.Y. 1 (a 24–hour local news program), CNN, Headline News, CNNFN, CNBC, MSNBC, plus the local stations providing news coverage of the City. *See* Reply Brief for Appellants at 25. Bloomberg acknowledges that BIT itself is available to New Yorkers for two hours a day on the USA Network, has a "presence" on PBS Television and NPR radio, and is seen by some New Yorkers 24 hours a day by owners of DIRECTV satellite dishes and by the subscribers of Liberty Cable and Cellular Vision.

**13.** As a contracting party to the Franchise Agreements, Time Warner clearly has standing to enforce their provisions. Since most of the edu-

cational or community groups, or the television viewer groups, who might also wish to enforce provisions protecting the use of PEG channels are not likely to have the means to sustain a legal challenge (and might not be regarded as third-party beneficiaries of the Franchise Agreements), the cable operator should be able, in enforcing its own rights, to assert the third-party interests of those whom the PEG channels are intended to serve.

**14.** We also express no views on whether an implied cause of action may be brought for alleged violations of the Cable Act or whether Time Warner might sue under 42 U.S.C. § 1983 to remedy an alleged governmental violation of the Act.

makes it important not to divert PEG channels to non-PEG purposes. Moreover, the needs of the viewing public for a diversified range of traditional commercial programming can be adequately met by the numerous non-PEG channels and the leased channel opportunities that Congress has required. *See* 47 U.S.C. § 532. Since the oral argument, we have been advised that Bloomberg has contracted to broadcast a commercial version of BIT on Channel 31 in New York City. Under the contract, which runs until August 1998, BIT will air 12 hours a day.

On balance, the public interest favors issuance of the injunction.

### Conclusion

The preliminary injunction issued by the District Court is affirmed.