**GREEN STRIPE, INC. and Christopher Di Piazza**

v.

**BERNY'S INTERNACIONALE, S.A. de C.V., Jose Antonio Gomez Astiazaran, Individually and as Representative of Minor Bernardo Gomez Cubillas, and Oscar Gomez Cubillas.**

No. CivA 01–CV–2360.

United States District Court, E.D. Pennsylvania.

June 15, 2001.

Sherry A. Swirsky, Schnader, Harrison, Segal & Lewis, Phila, PA, Jonathan S. Liss, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, for Green Stripe, Inc., plaintiff.

George H. Newman, Newman and Mc Glaughlin, P.C., Phila, PA, Richard D. Burris, Michael Joseph Butler, Law Offices of Richard D. Burris, Tucson, AZ, for Berny's Internacionale, S.A. de C.V., defendant.

## MEMORANDUM AND ORDER

SURRICK, District Judge.

This case involves a dispute over the right to distribute and receive the proceeds from the Spring 2001 harvest of grapes grown on two farms in Sonorra, Mexico. On May 14, 2001, Plaintiffs filed a Complaint for preliminary and permanent injunctive relief and damages, alleging that Defendants had breached certain agreements between the parties governing the distribution and proceeds of the grape harvest. Plaintiffs added a claim for unjust enrichment in an Amended Complaint filed June 4, 2001. On June 5, 2001, Plaintiff's filed a Motion for Temporary Restraining Order ("TRO"). Following a hearing held on June 6, 2001, this Court entered a TRO. A hearing was scheduled on Plaintiffs' Motion for Preliminary Injunction for June 12, 2001. The Court held the Preliminary Injunction hearing on June 12 and 13, 2001.[1] Upon consideration of the evidence and testimony received at the two-day hearing, the Court will grant Plaintiffs' Motion for Preliminary Injunction.[2]

## I. Factual Background

Plaintiff Green Stripe, Inc. ("Green Stripe") is Pennsylvania corporation with its principal place of business in Philadelphia. Pennsylvania. Green Stripe is in the business of marketing fresh produce around the world. The president of Green Stripe is Carl DiPiazza ("DiPiazza"). Defendant Jose Gomez is a citizen of Mexico whose family has owned and farmed land in Sonorra, Mexico for several generations. Defendant Berny's Internacionale, S.A. de C.V. ("Berny's") is a Mexican corporation with its principal place of business in Hermosillo, Sonorra, Mexico. Berny's was formed in 1997 as a joint venture by Carl DiPiazza and Jose Gomez.[3] During the time period at issue here, Jose Gomez was the Sole Administrator of Berny's.[4] Defendant Oscar Gomez is the adult son of Jose Gomez and a former employee of Green Stripe. Jose Gomez and Oscar Gomez handle day-to-day operations of Berny's farms in Mexico.

Berny's was originally formed to cultivate and harvest grapes and other crops on an existing farm owned by the Gomez

---

1. Three witnesses were presented at the hearing. Carl DiPiazza testified on behalf of Plaintiffs. Jose Gomez and Oscar Gomez testified on behalf of Defendants.

2. We note that because these proceedings are preliminary, the evidentiary requirements are relaxed. See Star Creations Investment Co., Ltd. v. Alan Amron Development Inc., No. Civ. A. 95–4328, 1995 WL 495126, * 10 (E.D.Pa. Aug.18, 1995)

3. All of the stock in Berny's was registered to Plaintiff Christopher DiPiazza, and Defendant

Bernardo Gomez, the minor son of Jose Gomez. From the testimony, it is apparent that Christopher DiPiazza's shares effectively belonged to Green Stripe and were controlled by his brother, Carl DiPiazza, on Green Stripe's behalf. The shares registered to Bernardo Gomez were controlled by Jose Gomez, acting as his son's representative.

4. As Sole Administrator, Jose Gomez exercised extensive control over Berny's farming and financial operations. See Exh. D–8.

family. This farm is known as Berny's I or Las Malvinas ("Berny's I").[5] Pursuant to the parties' joint venture, Berny's I was leased by the Gomez family to Berny's. Prior to the formation of Berny's, although Jose Gomez farmed the Gomez family farm, he did not pay rent to other Gomez family members for that right. After Berny's was formed, it acquired a second farm ("Berny's II"). This farm was acquired and developed with money supplied by Green Stripe. The parties initially operated under an oral agreement whereby Green Stripe would provide financing for the acquisition, improvement and operation of the farms in exchange for the right to market the crops produced thereon. During the period from 1997 through late 1999, Berny's received in excess of $5 million dollars from Green Stripe in the form of direct loans or letters of credit used to secure loans made to Berny's by banks in Arizona. Berny's used the funds provided by Green Stripe not only to acquire Berny's II but also to fund the improvement and operation of both farms. The improvements included such things as clearing and preparing the land, constructing worker dormitories, constructing pre-cooling storage facilities, purchasing wind machines, purchasing grape vines and structures to support the vines, drilling wells and making various repairs to farm equipment and facilities. From 1997 through the 2000 harvest, Green Stripe marketed most of the crops harvested by the Berny's farms. As a result of Green Stripe's investment, the Berny's farms are state-of-the-art and produce grapes of uniquely high quality for which there is no ready substitute on the market.

It appears that in late 1999 and early 2000, the relationship between the Gomezes, Green Stripe and Green Stripe's financial backer, Joseph Procacci, had deteriorated because of disputes that arose as a result of the parties' disagreements over the timeliness of Green Stripe's financing, the appropriateness of its marketing and the terms of the parties' financial arrangements. In early 2000, Green Stripe sought to protect its investment in the Berny's farms through two written agreements, the Subrogation and Security Agreement ("Security Agreement") and the Supplement to Subordination and Security Agreement ("Supplemental Security Agreement"). These agreements, which are dated February 8, 2000, provide that Green Stripe would arrange for or provide security for additional loans to Berny's. *See* Exh. P–6 P–7, D–45A and D–46A. The agreements further provide that any Berny's debts to Oscar Gomez would be subordinated to Berny's debts owed to Green Stripe, that liens in favor of Green Stripe on all of Berny's assets, including real estate, equipment and crops would be recorded and that Green Stripe would have the right to exclusively market and collect the proceeds of all sales of Berny's crops in order to pay off its loans to Berny's. *Id.*

Specifically, the Security Agreement recites that:

> Pursuant to the agreement between GreenStripe and First Union [National Bank, Philadelphia, Pennsylvania], First Union has issued, and may issue additional, Letters of Credit for the benefit of Norwest [Bank] for the account of GreenStripe to induce Norwest to make loans to [Berny's]. If Norwest draws upon any First Union Letter of Credit, GreenStripe is obligated to reimburse First Union for any amounts First Union pays under the First Union Letters of Credit, and therefore the parties have agreed to protect the interests of Green-

---

**5.** Defendants also refer to Berny's I as "La Labor."

Stripe as the ultimate party at risk on the loans made or hereafter made to [Berny's] by Norwest.

*See* Exh. P–6 and D–45A. Pursuant to the Supplemental Security Agreement, Green Stripe was to arrange for a loan by Norwest to Berny's of an additional $2 million supported by Green Stripe's letters of credit at First Union. The Supplemental Security Agreement specifically provides that:

All sales by [Berny's] of any of its crop, whether for cash or credit, and whatever the intended use thereof by the purchaser, *shall be sold exclusively by and through GreenStripe, whether for cash or credit, and GreenStripe shall exclusively collect the proceeds of all such sales.* From the proceeds of sales, GreenStripe shall cause the Norwest loans to [Berny's] to be reduced and paid off, make payments directly to Borrower's vendors, including suppliers of chemicals and other farming materials, and to make advances to [Berny's], upon GreenStripe's receipt of certifications from [Berny's] as to the purpose of the advance, for payroll and other labor expenses. GreenStripe shall account to [Berny's] for receipt and the use of proceeds, and upon repayment of the Norwest Bank loans and all other expenses of the current crop year, any excess shall be disbursed for the benefit of [Berny's] and/or its stockholders.

*See* Exh. P–7 and D–46A (emphasis added). Both agreements state that they are to be governed and construed according to Pennsylvania law. They also provide that they may be executed in multiple counterparts. From the evidence and testimony presented, it appears that Jose Gomez executed both agreements on behalf of Berny's after consultation with his counsel in Mexico, and then sent them to DiPiazza, who subsequently executed the agreements on behalf of Green Stripe.[6]

Between March 2000 and the end of November 2000, following the execution of the Security Agreement and Supplemental Security Agreement, Green Stripe provided Berny's with an additional $3.2 million in loans. Further, consistent with the terms of the agreements, a mortgage in the amount of $3 million was recorded in favor of Green Stripe on Berny's II. DiPiazza testified that the total amount of money that Green Stripe has advanced to Berny's since 1997 is approximately $14 million. Berny's total current debt to Green Stripe is approximately $9 million.

At the Preliminary Injunction hearing, Jose Gomez claimed that Green Stripe and Procacci refused to provide additional funds that he claims were urgently necessary to bring the Spring 2001 grape harvest to fruition. After unsuccessfully trying to obtain an agreement with other marketers to advance funds for and to market Berny's' Spring 2001 grape crop, Jose Gomez formed another company, Agricola Versatil, to buy the grapes produced by the Berny's farms. *See* Exh. D–43. In late April 2001, Jose Gomez, acting on behalf of both Berny's and Agricola Versatil, entered into purported contracts which sold all of the grapes grown on Berny's farms to Agricola Versatil for a period of 15 years.[7] These agreements

---

6. Jose Gomez testified that the agreements were not valid because both parties did not sign the original documents. He further claims that his execution of the agreements was conditioned upon Green Stripe providing the additional funds within five days, a condition which he states Green Stripe did not satisfy. Based on the evidence presented and the parties' course of conduct, we find that Plaintiffs have established a sufficient likelihood that the agreements constituted valid contracts.

7. The issue of whether Jose Gomez had authority to take such action on behalf of Berny's is contested.

provide for payments by Agricola Versatil to Berny's of $600,000 in the first year, and $120,000 in each successive year thereafter.

In April 2001, Jose Gomez entered into an agreement of behalf of Agricola Versatil with another marketer, Sales King, to market the grapes produced on the Berny's farms, which were now purportedly owned by Agricola Versatil. *See* Exh. D–42. Notwithstanding Green Stripe's exclusive right to market the grapes grown on the Berny's farms, the agreement between Agricola Versatile and Sales King gives Sales King the exclusive right to market the grapes in exchange for money it advanced for the Spring 2001 harvest. *Id.*

In reliance on its exclusive right to market the Berny's grapes, Green Stripe entered into an agreement with Costco, a U.S. company, under which Green Stripe would supply Costco with 60 percent of the Berny's Spring 2001 grape harvest. Green Stripe also entered into an agreement with Erms UK, a British company, for the remaining 40 percent of the 2001 harvest. These agreements were entered into after Carl DiPiazza had taken both Costco and Erms UK to visit and inspect the Berny's farms, and were based on Green Stripe's ability to deliver the high-quality grapes produced by Berny's. Subsequently, when Green Stripe began to suspect that Berny's and Jose Gomez might attempt to market the Spring 2001 grapes through another company, Green Stripe advised other marketing companies, including Sales King, of its claimed interest in and rights to the Berny's grapes. Thus far, Green Stripe has not received any of the Spring 2001 grapes harvested from the Berny's farms. As a result of Green Stripe's inability to obtain the Berny's grapes, Costco has advised that it will no longer take grapes from Green Stripe for this year, and Green Stripe's business relationship with Costco is in jeopardy. In addition, the present situation imminently threatens Green Stripe's current agreement and business relationship with Erms UK, which has suspended all of its agreements to purchase produce marketed by Green Stripe pending the resolution of the dispute involving the Berny's grapes.

The Spring 2001 grape harvest began on approximately May 15, 2001, and is expected to continue through mid- to late-June, 2001. Once harvested, the grapes, which are perishable, are transported to and briefly stored in Nogales, Arizona. From there they are distributed to the ultimate purchaser. According to Jose Gomez', approximately 60 percent of the approximately 100,000 boxes of grapes expected from Berny's II have already been harvested and provided to Sales King in Nogales, Arizona for distribution. The harvest of the remaining 40 percent is expected to be completed within the next three weeks. According to Jose Gomez, the harvest of the approximately 100,000 boxes of grapes expected from Berny's I was suspended three to four days ago due to a lack of sugar content in the grapes. Gomez testified that approximately 1,000 boxes had been harvested thus far. He stated that he did not know when that harvest would resume.

## II Preliminary Injunction

In determining whether to grant a preliminary injunction, the court must consider (1) whether the movant has demonstrated a reasonable probability of eventual success on the merits; (2) whether the movant has demonstrated that it will be irreparably harmed if relief is not granted; (3) the possibility of harm to other interested persons from the grant or denial of the injunction; and (4) the public interest. *See e.g., Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir.1999); *Or-*

*tho Pharmaceutical Corp. v. Amgen, Inc.,* 882 F.2d 806, 812–813 (3d Cir.1989). Applying these factors to the evidence presented, we find that Plaintiffs have satisfied the elements for injunctive relief.

We are satisfied that Plaintiffs have established a reasonable probability that they will prevail on their breach of contract and unjust enrichment claims. Plaintiffs produced evidence that the parties executed two written contracts which expressly gave Green Stripe the exclusive right to market the grapes produced on the Berny's farms. These grapes are a unique and perishable commodity. Within the nine months immediately following the execution of these agreements, Green Stripe invested approximately $3.2 million in Berny's. The evidence concerning these agreements, combined with evidence of the parties' course of dealing, demonstrate a likelihood that Plaintiffs can prove that enforceable contracts existed between the parties giving Green Stripe the exclusive right to market and receive the proceeds from crops harvested on the Berny's farms. *See Ebeling & Reuss Ltd. v. Swarovski Int'l Trading Corp. A.G.,* Civ. A. No. 88–4878, 1988 WL 79797, *1 (E.D.Pa. July 29, 1988). Moreover, it is apparent that Defendants have deliberately attempted to evade these agreements, and have breached them by selling Berny's Spring 2001 grapes to the newly-formed Agricola Versatil and entering into an agreement with Sales King for the marketing of the grapes. We are satisfied that Plaintiffs have made a sufficient showing that they would be entitled to specific performance as a remedy. *See Allegheny Energy,* 171 F.3d at 159–160 (damages are an inadequate remedy where the agreement concerns an unique asset the equivalent of which cannot be purchased on the market); *Campbell Soup Co. v. Wentz,* 172 F.2d 80, 82 (3d Cir.1948) (legal remedy inadequate where goods were unavailable on the open market, plaintiff had contracted for them in advance in anticipation of his needs and had built a reputation based on the goods used).

Plaintiffs' claim for unjust enrichment is also supported by the evidence. "The elements of unjust enrichment are: a benefit conferred on the defendant by the plaintiff; appreciation of such benefit by defendant; and, acceptance and retention of such benefit under circumstances making it inequitable for defendant to retain the benefit without payment of value." *F.T. Int'l, Ltd. v. Mason,* No. Civ. A. 00–5004, 2000 WL 1514881, * 1 (E.D.Pa. Oct.11, 2000). It is not disputed that over the course of the approximately three years between 1997 and 2000, Berny's received as much as $14 million from Green Stripe. Berny's currently owes Green Stripe a balance of approximately $9 million. Clearly, Green Stripe's investment in Berny's went well beyond the "typical" marketing agreement under which a marketer advances funds for a particular crop in exchange for the right to market and receive a commission on the proceeds from the sale of that crop. Green Stripe's loans financed not only the acquisition of Berny's II, they also funded the long-term improvements on both farms described above. In fact, Jose Gomez admitted that he had never dealt with any other marketer who had funded the purchase of land or such improvements and acknowledged that Berny's would not have been able to purchase and improve Berny's II without the loans from Green Stripe. Under these circumstances, we conclude that Plaintiffs would likely prevail on their claim for unjust enrichment.

With respect to the second requirement for preliminary injunction, Plaintiffs have established that they are likely to suffer imminent, irreparable harm that cannot adequately be remedied by money damages. The evidence presented at the Pre-

liminary Injunction hearing supports Plaintiffs' contention that absent an injunction, "Green Stripe is out of the Mexican grape market." *See* Motion for Temporary Restraining Order, p. 6. Plaintiffs offered credible evidence that the grapes produced by Berny's are a unique, perishable product for which Green Stripe cannot obtain a substitute on the market. *See Kellerman v. Chase & Co.,* 101 Fla. 785, 135 So. 127 (1931) (noting the perishable nature of crop and brief harvest season, court granted injunction requiring grower to deliver tomatoes to marketing company that had advanced money in consideration for right to receive entire crop); *Ferry–Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589 (8th Cir.1984) (granting injunction compelling delivery of "unique" seed corn with no to plaintiff that had contracted for exclusive license to market corn). Green Stripe has already lost the agreement with Costco for sale of the grapes from Berny's farms and is in danger of losing the Erms UK agreement. Green Stripe's inability to market grapes that it promised to its customers also threatens harm to Green Stripe's reputation and good will in the produce marketing industry. *See Cyber Promotions, Inc. v. Apex Global Information Services, Inc.,* No. Civ. A. 97–5931, 1997 WL 634384, at *3 (E.D.Pa. Sept. 30, 1997).

Defendants contend that an injunction would render Berny's unable to secure advances from other marketers to fund future crops. Although we recognize that this risk may exist, the fact remains that Berny's accepted and retains substantial benefit from more than $9 million in loans it received from Green Stripe over the past three years. That money was used to create the subject grape crop. This investment and the above-referenced contracts give Green Stripe an equitable interest in the 2001 crop, the proceeds of which are likely to be dissipated if the injunction is not granted. *See HCB Contractors v. Rouse & Assoc., Inc.,* No. 91–CV–5350, 1992 WL 176142, *8–9 (E.D.Pa. July 13, 1992) (discussing creation of equitable liens). We are satisfied that at this stage, an injunction is appropriate to restore the status quo as it existed before Jose Gomez unilaterally sold the Berny's grapes to Agricola Versatil, effectively extinguishing Green Stripe's rights to the crops and its ability to secure repayment of its loans to Berny's. *See Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Services of Virginia, L.L.C.,* No. 01 Civ. 2691(RO), 2001 WL 527472, *7 n. 9 (S.D.N.Y. May 15, 2001) (collecting cases holding that where plaintiff has an equitable interest in defendant's assets, court may issue injunction freezing defendant's assets to prevent their dissipation and preserve status quo); *Ortho Pharmaceutical,* 882 F.2d at 814 (court must attempt to minimize likely harm to legally protected interests between the filing of preliminary injunction motion and the time of final hearing).

Finally, we conclude that an injunction is consistent with the public interest in requiring parties to live up to their legal contracts. *See Siemens Building Technologies, Inc. v. Camacho,* No. Civ. A. 01–1613, 2001 WL 395294, *2 (E.D.Pa. April 18, 2001) (it is in the public interest to enforce valid contracts and protect legitimate business interests); *Cyber Promotions, supra,*1997 WL 634384, at *3.

An appropriate order follows.

### ORDER

AND NOW, this 15th day of June, 2001, upon consideration of Plaintiffs' Motion for Preliminary Injunction and the evidence and arguments presented at the hearing held on June 12 and 13, 2001, and for the reasons set forth in the accompanying

Memorandum, it is hereby ORDERED as follows:

1. Plaintiffs' Motion for Preliminary Injunction is GRANTED.

2. Defendants are ORDERED to forthwith deliver the grapes harvested on or after June 7, 2001 from the farms known as Berny's I, also known as Las Malvinas, and Berny's II, regardless of the name under which they are currently being marketed, to Green Stripe in the same manner as Defendants would use in delivering grapes to another marketer or importer.

3. With respect to all grapes delivered to Green Stripe pursuant to Paragraph 2, above, Green Stripe shall pay to Defendants $2.00 per box on account of picking, packing and shipping charges.

4. To the extent that grapes harvested on or after June 7, 2001 from the farms known as Berny's I, also known as Las Malvinas, and Berny's II have already been sold, Defendants are ORDERED to remit to Green Stripe the proceeds of such sales for placement in an escrow account at First Union Bank, Philadelphia, Pennsylvania.

5. Defendants are enjoined from marketing, selling or otherwise transferring grapes harvested on or after June 7, 2001 from the farms known as Berny's I, also known as Las Malvinas, and Berny's II to anyone other than Green Stripe, and shall take all steps necessary to arrange for the immediate transfer to Green Stripe of any grapes currently in transit, storage, or in the possession of any other marketing agent.

6. This Preliminary Injunction shall issue upon Plaintiffs' posting of security pursuant to Fed.R.Civ.P. 65(c) in the amount of $1,200,000.00 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

7. This Order is binding upon each Defendant and their officers, agents, servants, employees and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the Order by personal service or certified mail. Counsel for Plaintiffs is directed to notify each Defendant of the existence of this Order, and to certify to the Court that such notification has been made.

7. This Order supercedes the Temporary Restraining Order entered June 6, 2001, and shall remain in effect pending further Order of this Court.