**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 29 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

_____

DOMINION VIDEO SATELLITE, INC.,

    Plaintiff-Appellee,

v.

ECHOSTAR SATELLITE CORPORATION and
ECHOSPHERE CORPORATION,

    Defendants.
_____

WORD OF GOD FELLOWSHIP,
INCORPORATED, a Georgia Corporation, doing
business as Daystar Television Network,

    Intervenor-Appellant,

and

TRINITY CHRISTIAN CENTER OF SANTA ANA,
INC., doing business as Trinity Broadcasting
Network; TRINITY BROADCASTING OF
ARIZONA; TRINITY BROADCASTING OF
FLORIDA, INC.; TRINITY BROADCASTING OF
INDIANA, INC.; TRINITY BROADCASTING OF
NEW YORK, INC.; TRINITY BROADCASTING
OF OKLAHOMA CITY, INC.; TRINITY
BROADCASTING OF TEXAS; TRINITY
BROADCASTING OF WASHINGTON; TRI-
STATE CHRISTIAN TV, INC.; TCT OF

No. 03-1274

MICHIGAN, INC.; RADIANT LIFE MINISTRIES, INC.; FAITH BROADCASTING NETWORK; FAMILYNET, INC.,

    Amici Curiae.

---

DOMINION VIDEO SATELLITE, INC.,

    Plaintiff-Appellee,

v.

ECHOSTAR SATELLITE CORPORATION and ECHOSPHERE CORPORATION,

    Defendants-Appellants.

_____

WORD OF GOD FELLOWSHIP, INCORPORATED, a Georgia Corporation, doing business as Daystar Television Network,

    Intervenor,

and

TRINITY CHRISTIAN CENTER OF SANTA ANA, INC., doing business as Trinity Broadcasting Network; TRINITY BROADCASTING OF ARIZONA; TRINITY BROADCASTING OF FLORIDA, INC.; TRINITY BROADCASTING OF INDIANA, INC.; TRINITY BROADCASTING OF NEW YORK, INC.; TRINITY BROADCASTING OF OKLAHOMA CITY, INC.; TRINITY BROADCASTING OF TEXAS; TRINITY BROADCASTING OF WASHINGTON; TRI-STATE CHRISTIAN TV, INC.; TCT OF

No. 03-1303

-2-

MICHIGAN, INC.; RADIANT LIFE MINISTRIES, INC.; FAITH BROADCASTING NETWORK; FAMILYNET, INC.,

Amici Curiae.

---

**Appeal from the United States District Court for the District of Colorado (D.C. No. 03-K-607 (CBS))**

---

Donald M. Barnes of Porter, Wright, Morris & Arthur, LLP, Washington, D.C. (Salvatore A. Romano and Brian M. Castro of Porter, Wright, Morris & Arthur, LLP, Washington, D.C.; Thomas E. Downey, Jr., of Downey & Knickerehm, P.C., Denver, Colorado; and John Lynch, Jr. of Adams Lynch & Loftin P.C., Bedford, Texas, with him on the briefs), for Intervenor-Appellant Word of God Fellowship, Incorporated, in No. 03-1274.

Ross W. Wooten of T. Wade Welch & Associates, Houston, Texas (T. Wade Welch of T. Wade Welch & Associates, Houston, Texas; and Todd Jansen of Cockrell, Quinn & Creighton, Denver, Colorado, with him on the briefs), for Defendants-Appellants EchoStar Satellite Corporation and Echosphere Corporation in No. 03-1303.

Mark D. Colley of Holland & Knight LLP, Washington, D.C. (Thomas D. Leland of Holland & Knight LLP, Washington, D.C.; and Allan L. Hale and Scott A. Hyman of Hale Hackstaff Friesen, LLP, Denver, Colorado, with him on the briefs), for Plaintiff-Appellee, Dominion Video Satellite, Inc., in Nos. 03-1274 and 03-1303.

Colby M. May and James M. Henderson, Sr., filed an amicus curiae brief on behalf of Trinity Christian Center of Santa Ana, Inc., et al.

John T. Schmidt, Conrad M. Shumadine, Gary A. Bryant and Michael R. Katchmark of Willcox & Savage, P.C., filed an amicus curiae brief on behalf of FamilyNet, Inc.

Before **SEYMOUR**, **MURPHY** and **HARTZ**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

This appeal arises out of a contract dispute between EchoStar Satellite Corporation and Echosphere Corporation (EchoStar) and Dominion Video Satellite, Inc. (Dominion). Asserting EchoStar was violating its contract, Dominion moved for a preliminary injunction to prevent EchoStar from taking further action and to preserve the status quo while the merits of the case were being decided. In the course of these proceedings, Word of God Fellowship, Inc., d/b/a Daystar Television Network (Daystar), brought a motion to intervene as an interested party under Federal Rule of Civil Procedure 24. The district court denied Daystar's motion, granted Dominion's request for a preliminary injunction, and ordered the parties to begin arbitration proceedings pursuant to their contract. We granted EchoStar's motion to stay temporarily the district court's injunction pending appeal. Both EchoStar and Daystar challenge the district court's rulings on appeal.[1] We reverse the district court's entry of a preliminary injunction and

---

[1]EchoStar and Daystar appealed separately; we have consolidated their appeals for the purpose of this disposition.

-4-

deem Daystar's appeal moot.[2]

# I

EchoStar and Dominion both operate direct broadcast satellite systems (DBS) regulated and licensed by the Federal Communications Commission (FCC). EchoStar's DBS network is broadcast as the DISH Network, and Dominion's network is called SkyAngel. Through the SkyAngel network, which is in part comprised of twenty television channels, Dominion provides predominately Christian programming to its viewers. Conversely, the DISH Network broadcasts an extensive variety of programming which is not limited to any specific genre and offers over 150 channel options to subscribers.

EchoStar has a satellite from which it broadcasts its DISH Network programming. That satellite contains more transponders than EchoStar is permitted to use under its FCC license.[3] In order to enlarge its broadcast capabilities from this satellite, EchoStar entered into a contract (the Agreement) with Dominion under which Dominion leased eight transponders from EchoStar's satellite, and then subleased six of those transponders back to EchoStar along

---

[2]Because we conclude the district court erred in granting the preliminary injunction, we need not further address the parties' additional requests for stays pending appeal, which we consolidated with the merits of this action by court order on July 22, 2003.

[3]A transponder is a device on a satellite that receives signals from Earth and then transmits those signals back to the planet for reception covering a broad area.

with the accompanying FCC licence rights Dominion held. EchoStar was thereby able to increase its broadcast scope, and SkyAngel was able to broadcast via the satellite. As a result of this arrangement, SkyAngel subscribers are required to purchase DISH-brand equipment in order to receive Dominion's broadcasting from the EchoStar satellite. Consequently, both EchoStar and Dominion compete for the same customer market: individuals who wish to receive satellite-television programming and who are willing to buy DISH-brand equipment. Recognizing this potential for competition and acknowledging Dominion's interest in providing programming to a specific sub-set of satellite-television viewers–those who wish to watch only Christian themed broadcasting–the parties included a programming exclusivity clause in the Agreement. Under the terms of the clause, Dominion has the exclusive right to transmit Christian programming from EchoStar's satellite, while EchoStar may broadcast everything except predominantly Christian programming.[4]

---

[4]In relevant part, Article VIII (Programming Exclusivity), section 8.1 (Exclusive Programming) states that:

> programming carried by Dominion and the DISH group shall be mutually exclusive. In this regard, and without limiting the generality of the foregoing, except as set forth [in other portions of this Agreement], Dominion shall be entitled pursuant to this Agreement to transmit Christian Programs to Dominion Members and DISH™ subscribers on an exclusive basis and the DISH Group shall be entitled pursuant to this Agreement to transmit all other video (including but not limited to entertainment and business television

(continued...)

The Agreement also states that should either party breach the agreement, money damages would be insufficient, the harm from the breach would be irreparable, and the non-breaching party would have the right to obtain specific performance or injunctive relief.[5] The Agreement stipulated that "[a]t the election of either party, any matter not resolved amicably between the parties to the satisfaction of both parties, shall be subject to mandatory binding arbitration,

---

[4](...continued)
programs), audio, data and other services, to Dominion Members and DISH™ subscribers on an exclusive basis.
Aple. App., doc. 2 at 38.

[5]Article XII (Term, Termination and Other Remedies on Default), section 12.3.1 (Specific Performance) states:
the rights and benefits of each of the parties pursuant to this Agreement are unique and that no adequate remedy exists at law if any of the parties shall fail to perform, or breaches, any of its obligations hereunder; that it would be difficult to determine the amount of damages resulting therefrom, and that such breach would cause irreparable injury to the nonbreaching parties . . . .
Accordingly, each of the parties hereto hereby agrees that the nonbreaching parties shall, in addition to any other remedies that such nonbreaching parties may have hereunder, at law, in equity or otherwise, have the right to have any and all obligations, undertakings, agreements, and other provisions of this Agreement specifically performed by such nonbreaching parties and shall have the right to obtain an order or decree of such specific performance, or a preliminary or permanent injunction (without the necessity of posting or filing a bond or other security) against the breach or threatened breach of any term or in aid of the exercise of any power or right granted in this Agreement . . . . It is expressly agreed that monetary damages alone would not be adequate to fully and fairly compensate for a breach by the breaching party of any provision of this Agreement.
*Id*. at 52.

and the other party shall submit to arbitration." Aple. App., doc. 2 at 59.

Despite the terms of the agreement, EchoStar began broadcasting two predominantly Christian channels on the DISH Network: Daystar and FamilyNet. EchoStar rejected Dominion's assertions that the broadcasts violated the exclusivity clause in the Agreement, contending it was acting in compliance with FCC regulations requiring DBS operators to set aside four percent of their available channel capacity for public interest programming. *See* 47 U.S.C. § 335(b); 47 C.F.R. § 25.701(c). Dominion disagreed and sued to enjoin EchoStar from broadcasting Daystar and FamilyNet pending arbitration between the parties. In the course of these proceedings, Daystar sought to intervene as an interested party. The district court denied Daystar's motion to intervene, granted Dominion's request for a preliminary injunction, and ordered the parties to submit to arbitration. Both EchoStar and Daystar now appeal.

**II**

EchoStar contends the district court erred by granting Dominion's request for a preliminary injunction. "We will not set aside a preliminary injunction '[u]nless the district court abuses its discretion, commits an error of law, or is clearly erroneous in its preliminary factual findings . . . .'" *SCFC ILC, Inc. v. VISA USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991) (citing *Hartford House, Ltd. v. Hallmark Cards*, 846 F.2d 1268, 1270 (10th Cir. 1988)).

It is well established that in order to obtain a preliminary injunction, the moving party must establish four factors: (1) it will suffer irreparable harm if the injunction is not granted, (2) its threatened injury outweighs the harm caused to the opposing party as a result of the injunction, (3) the injunction is not adverse to the public interest, and (4) it has a substantial likelihood of success on the merits of the case. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). In examining these factors, courts have consistently noted that "[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (internal quotations omitted); *see also Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (per curiam); *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 233 (S.D.N.Y. 2002); *Paradise Distribs., Inc. v. Evansville Brewing Co., Inc.*, 906 F. Supp. 619, 622 (N.D. Okla. 1995). Likewise, because "a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *SCFC ILC, Inc.*, 936 F.2d at 1098 (internal citation omitted).

In granting Dominion's request for a preliminary injunction against EchoStar, the district court found, in part, that Dominion had suffered irreparable

harm as a result of EchoStar's alleged breach of the Agreement. The court based its determination on two intertwined grounds. First, it gave great weight to section 12.3.1 of the parties' Agreement, in which EchoStar and Dominion agreed that any violation of their contract would constitute irreparable injury and would therefore warrant injunctive relief. While the court declined to bind itself wholly to the parties' private determination regarding irreparable harm, it nonetheless concluded that "the understanding reflected in § 12.3.1 of the parties' Agreement in this case is a clear and unavoidable concession of [irreparable harm] and I will treat it as such." Jt. App., Vol. II at 441.

In making its irreparable harm determination, however, the district court rejected all of Dominion's proffered arguments regarding how it suffered harm as a result of EchoStar's breach of the Agreement. Based on evidence presented by EchoStar, the court dismissed Dominion's assertion that its very existence was threatened by EchoStar's broadcast of Daystar and FamilyNet, noting Dominion had not shown it was "losing customers or [its] competitive position in the marketplace because of the violation of the exclusivity provisions. At most, Dominion simply states that such losses are an inevitable result. The statement is wholly conclusory and, standing alone, would not justify the issuance of a preliminary injunction." *Id.* at 442. The court similarly rejected Dominion's contentions that it was close to business failure and that damage to its business

could not be quantified:

> In fact, the opposite appears to be the case. EchoStar's expert witnesses persuasively demonstrated that a loss in the marketplace because of a particular reason would be readily determinable if proper methodology were used. There is simply no basis for finding that Dominion has suffered harm to its goodwill as a result of EchoStar's actions.

*Id.* In the appeal before us, Dominion does not challenge any of these findings.

Despite the court's wholesale rejection of Dominion's specific arguments regarding irreparable harm, the court nonetheless found Dominion had satisfied the irreparable harm factor of the preliminary injunction test. In reaching its conclusion, the court focused on what it deemed to be the unique nature of the exclusivity provisions of the Agreement. The court found that by leasing eight transponders on EchoStar's satellite and then subleasing six of those transponders and their accompanying FCC licence rights back to EchoStar, Dominion limited its viewing market to customers who will either own or purchase DISH-brand equipment. Moreover, Dominion did so in exchange for the exclusive right to broadcast Christian programming to such customers, while granting EchoStar the exclusive right to broadcast all other types of programming. In examining EchoStar's alleged breach of the Agreement's exclusivity provisions, the district court found "it is the loss of programming exclusivity itself that creates the irreparable harm. Not only did Dominion and EchoStar say as much in § 12.3.1, but the very essence of the Agreement establishes it." *Id.*

In making its irreparable harm finding, the district court thus essentially determined that Dominion's loss of exclusivity rights, in and of itself, constituted the requisite irreparable harm. It found such harm existed regardless of Dominion's inability to show any threat to its existence, damage to its goodwill, loss of customers, or loss of its competitive position in the market. Such harm existed, the district court held, irrespective of its conclusion that Dominion's potential marketplace losses could be quantified in damages.

After a careful and thorough analysis of the relevant case law, we cannot sustain the district court's ruling. Certainly the court's conclusion is initially attractive, and we agree with the generally accepted position that breach of an exclusivity clause almost always warrants the award of injunctive relief. *See, e.g., Walgreen Co. v. Sara Creek Prop. Co. B.V.*, 966 F.2d 273, 279 (7th Cir. 1992) (noting permanent injunction may be presumptively appropriate remedy upon the breach of exclusivity clause); *Shred-It USA, Inc.*, 202 F. Supp. 2d at 233 (violation of do-not-compete clause generally results in incalculable damages warranting finding of irreparable harm); *J.C. Penney Co., Inc. v. Giant Eagle, Inc.*, 813 F. Supp. 360, 369 (W.D. Pa. 1992) (citing *Walgreen Co.* for proposition that irreparable harm is almost always inherent in breach of exclusivity clause cases), *aff'd*, 995 F.2d 217 (3d Cir. 1993). And, absent the district court's rejection of Dominion's specific irreparable harm arguments, which findings are

unchallenged in this appeal, we would be inclined to reach a different conclusion in this case. However, precedent constrains us from holding that the breach of an exclusivity provision alone satisfies the irreparable harm factor of the preliminary injunction test.[6]

In reversing the district court, we note this case is a difficult one for which no sufficiently direct precedent exists. In reaching our conclusion, we have drawn guidance from cases involving do-not-compete clauses in employment contracts, exclusivity clauses in distribution and franchise agreements, and restrictive covenants in real estate leases. These cases take us on a somewhat circuitous and disjointed journey, but nonetheless provide a series of guideposts which lead us to our conclusion that the district court erred in its irreparable harm ruling.

Determining whether irreparable harm exists can be a difficult and close question. We have noted that "[t]he concept of irreparable harm . . . 'does not

---

[6]Because we hold the district court erred in its irreparable harm determination and consequently should not have issued the preliminary injunction, we need not address the parties' arguments regarding the appropriate standard the district court should have employed in evaluating Dominion's request for injunctive relief. *See SCFC ILC, Inc., v. VISA USA, Inc.*, 936 F.2d 1096, 1098-99 (10th Cir. 1991) (a heightened standard should be employed for disfavored injunctions that alter the status quo, are mandatory rather than prohibitory, or provide the moving party with substantially all the relief it could obtain after a full trial on the merits). Regardless of the standard employed, Dominion's request for an injunction cannot succeed because we conclude that the district court erred in finding Dominion suffered irreparable harm.

-13-

readily lend itself to definition,'" *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (citation omitted), nor is it "an easy burden to fulfill." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). In defining the contours of irreparable harm, case law indicates that the injury "must be both certain and great, and that it must not be merely serious or substantial." *Prairie Band of Potawatomi Indians*, 235 F.2d at 1250 (internal citation and quotations omitted).

As noted earlier, it is clear that irreparable harm often arises from the breach of an exclusivity clause. *See, e.g., Walgreen Co.*, 966 F.2d at 279; *Shred-It USA, Inc.*, 202 F. Supp. 2d at 233; *J.C. Penney Co., Inc.*, 813 F. Supp. at 369. Despite the general acknowledgment that irreparable harm often arises from the breach of this type of agreement, courts do not automatically, nor as a matter of course, reach this conclusion. Rather, they examine whether the harms alleged by the party seeking the preliminary injunction are in fact irreparable, and sometimes conclude in the negative. *See, e.g., Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) (rejecting argument that irreparable harm automatically follows breach of covenant not-to-compete, especially in light of plaintiff's inability to show loss of goodwill or any other type of harm); *A.L.K. Corp. v. Columbia Pictures Inds., Inc.*, 440 F.2d 761, 763-64 (3d Cir. 1971) (violation of exclusive licensing agreement not irreparable harm where no injury

to goodwill was demonstrated and damages could be calculated); *Mountain Med. Equip., Inc. v. Healthdyne, Inc.*, 582 F. Supp. 846, 848-49 (D. Colo. 1984) (no irreparable harm from violation of non-disclosure agreement where past and future losses, as well as past lost goodwill, were quantifiable). *See also Paradise Distribs., Inc.*, 906 F. Supp. at 623 n.4 (exclusive right to distribute product not sufficient by itself to support irreparable harm finding).

Courts finding irreparable harm from breaches of exclusivity provisions have not rested their determinations solely on the existence and subsequent breaches of the exclusivity provisions. Rather, they have identified the following as factors supporting irreparable harm determinations: inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products. *See, e.g., Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-39 (2d Cir. 1995) (loss of prospective goodwill through inability to market unique product constituted irreparable harm); *JAK Prods., Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir. 1993) (under Indiana law, when employee uses experience gained from employer in violation of covenant not-to-compete, irreparable injury occurs); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511-12 (6th Cir. 1992) (violation of covenant not-to-compete constituted irreparable harm where damages were difficult to calculate, customer goodwill

was damaged, and plaintiff suffered loss of competitive position); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (irreparable harm established from violation of covenant not-to-compete where intangibles like advertising efforts and goodwill were injured); *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (irreparable harm exists where damages from breach of covenant not-to-compete difficult to calculate); *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 592 (8th Cir. 1984) (breach of exclusive distribution agreement constituted irreparable harm where company was disadvantaged in competitive market by inability to market unique seed corn); *Shred-It USA, Inc.*, 202 F. Supp. 2d at 233-34 (loss of employee's unique services to competitor in violation of do-not-compete agreement constituted irreparable harm); *Green Stripe, Inc. v. Berny's Internacionale, S.A.*, 159 F. Supp. 2d 51, 56-57 (E.D. Pa. 2001) (violation of exclusivity clause in sales contract constituted irreparable harm where plaintiff was denied ability to sell unique, perishable grape and lacked market substitute to maintain its presence in Mexican grape market); *J.C. Penney Co., Inc.*, 813 F. Supp. at 369 (inherent nature of exclusive provision in lease coupled with damage to goodwill, difficulty of calculating damages, and unique nature of interest in real estate constituted irreparable harm); *Walgreen Co. v. Sara Creek Prop. Co.*, 775 F. Supp. 1192, 1197 (E.D. Wisc. 1991) (where exclusivity clause in lease was breached, loss of

goodwill, erosion of customer base, and diminution of corporate image provided grounds for finding irreparable harm), *aff'd*, 966 F.2d 273 (7th Cir. 1992); *see also Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1498 (10th Cir. 1993) (loss of uniqueness in marketplace satisfied irreparable harm factor where plaintiff established harm to goodwill and difficulty in calculating damages); *Reuters Ltd.*, 903 F.2d at 907-09 (loss of unique product and goodwill supports finding of irreparable harm when customers indicate a strong preference for the product and threaten discontinuation of business relationship).

From this litany of cases, we glean the general lesson that while irreparable harm is frequently found upon the breach of an exclusivity provision, that finding does not rest solely on the breach of the agreement and the resulting loss of exclusivity rights. Rather, the irreparable harm findings are based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position.

In accordance with the collective instruction provided by the cases, we conclude that the district court's determination of irreparable harm cannot stand because of its own findings. As we noted, the district court wholly dismissed Dominion's assertions supporting its irreparable harm claim. The court refused to accept that Dominion's very existence was threatened, that it was losing

customers or its competitive position in the marketplace, that it was close to business failure, or that it had suffered harm to its goodwill. It was also persuaded by EchoStar's witnesses that any damages pending a decision on the merits could be quantified. Having rejected virtually all of the factors courts normally rely upon to support a finding of irreparable harm, the district court hinged its harm finding on its determination that the unique nature of Dominion's exclusivity rights, and the loss thereof, established irreparable harm.

Certainly there are cases in which courts have made findings of irreparable harm based on the loss of unique rights protected by contract. But those cases are distinguishable from the controversy here because they focus on harm to a unique market position based on evidence of loss of a unique product or goodwill, or difficulty in calculating damages. *See, e.g., Tom Doherty Assocs., Inc.*, 60 F.3d at 38 (irreparable harm arises where loss of ability to market unique product damages company's prospective goodwill); *Reuters Ltd.*, 903 F.2d at 907-08 (damages to goodwill as a result of loss of unique product supports finding of irreparable harm); *Ferry-Morse Seed Co.*, 729 F.2d at 592 (company irreparably harmed where it would suffer disadvantage in competitive market by inability to sell unique product); *Green Stripe, Inc.*, 159 F. Supp. 2d at 56-57 (irreparable harm arises from denial of ability to sell unique product and inability to obtain market substitute); *J.C. Penney Co., Inc.*, 813 F. Supp. at 369 (irreparable harm

-18-

found, in part, from acknowledgment that damage to interest in real estate is generally viewed as unique); *see also Autoskill, Inc.*, 994 F.2d at 1498 (loss of unique position in marketplace evidenced by harm to goodwill and difficulty in calculating damages). Here the district court rejected Dominion's arguments regarding loss of goodwill and difficulty in calculating damages. Nor has Dominion been denied the ability to market its unique product of predominantly Christian programming. While DISH subscribers can access two Christian channels on EchoStar, Daystar and FamilyNet, if they want a full range of twenty channels of exclusively Christian programming, which is actually what is unique about Dominion's product, they still have to subscribe to Dominion's SkyAngel. All Dominion is currently being denied temporarily is the opportunity to market its product to individuals with DISH-brand equipment without any competition from the two stations available to those who subscribe to EchoStar.

Nothing in the record persuades us that the rights inherent under the exclusivity clause in the Agreement are so unique that we should make an exception to the line of cases in which courts have found irreparable harm only after determining the existence of such intangible factors as the inability to calculate damages or the loss of goodwill or competitive market position. The district court's determination that Dominion's loss of exclusivity rights constitutes irreparable harm, without requiring any other showing but the breach

-19-

of the exclusivity agreement and in the face of EchoStar's evidence to the contrary, cuts a wide and unacceptable swath across countless cases undermining that very position. Were we to affirm the district court's finding on irreparable harm, we would in essence be ruling that whenever a party enters into a contract containing some form of exclusivity provision, injunctive relief is automatic upon breach of the clause even when the breaching party has refuted every assertion of specific irreparable harm put forth by the opposing party. We are not willing to go that far.[7]

---

[7]The cases upon which Dominion relies to make its irreparable harm argument, many of which we have already discussed, can all be easily distinguished. In particular, we note that *Denver & R.G.W. Ry. Co. v. Linck*, 56 F.2d 957, 960 (10th Cir. 1932), involved exclusive franchise rights arising out of a state-issued permit rather than a contract entered into between the parties, and Utah law expressly provided that an injunction should issue where a party's exclusive franchise rights were violated.

*Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917 (2d Cir. 1997), is also distinguishable. The court determined there that Time Warner suffered irreparable harm when it lost control over the mix of programming it provided on its cable system. *Id.* at 924. The City of New York aired programming on the system's government set-aside channels which was arguably in violation of the parties' franchise agreement–an agreement mandated and governed by statute. *Id.* at 923-25. We are not persuaded Time Warner's loss of programming control over its own channels is analogous to Dominion's loss of the exclusive right to provide programming to a certain portion of a viewing market. In any event, the question remains whether the loss of exclusivity rights, in and of itself, automatically constitutes irreparable harm. As discussed above, the answer to that question is no.

Nor do the Colorado cases regarding irreparable harm findings in do-not-compete cases bolster Dominion's argument. In *Ditus v. Beahm*, 232 P.2d 184, 185 (Colo. 1951), the Colorado Supreme Court indicated its overwhelming

(continued...)

The district court's related justification for finding irreparable harm was the parties' stipulation to it in section 12.3.1 of the Agreement. While courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief. *See, e.g., Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient

---

[7](...continued)
preference for and general presumption that awarding injunctive relief is appropriate upon the breach of a do-not-compete contract arising out of the sale of a business. In *Harrison v. Albright*, 577 P.2d 302 (Colo. Ct. App. 1977), *Ditus'* holding was extended to a case involving a do-not-compete clause in a loan security agreement. *Id*. at 305. However, the court in *Harrison* noted that *Ditus'* presumption of irreparable injury was rebuttable. *Id. See also Am. Television & Communications Corp. v. Manning*, 651 P.2d 440, 444-46 (Colo. Ct. App. 1982) (noting *Ditus* presumption of irreparable harm and finding that evidence regarding loss of goodwill substantiated conclusion that irreparable harm existed). Here, EchoStar challenged Dominion's assertions of irreparable harm by presenting evidence to the district court. The court largely accepted EchoStar's contentions, as evidenced in its findings that any potential losses suffered by Dominion could be quantified; Dominion's very existence was not being threatened; it was losing neither customers nor its competitive position in the marketplace; it was not close to business failure; and it had not suffered any harm to its goodwill. Therefore, even under *Ditus* and *Harrison*, any presumption of irreparable harm was rebutted here.

prop."); *Baker's Aid*, 830 F.2d at 16 ("contractual language declaring money damages inadequate in the event of a breach does not control the question of whether preliminary injunctive relief is appropriate"); *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001) (provision in contract providing that breach would cause irreparable damage is merely one factor to be examined in making irreparable harm determination); *Dice*, 887 F. Supp. at 810 (contractual provision cannot act as substitute for finding by court regarding injunctive relief); *Firemen's Ins. Co. of Newark v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990) ("it is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate"). Instead, the courts also identify other factors which establish that the harm is indeed irreparable. *See, e.g., North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (loss of trade secrets); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68-69 (2d Cir. 1999) (difficulty in calculating damages plus New York law dictating that violation of covenant not to compete constitutes irreparable injury); *True North Communications Inc. v. Publicis S.A.*, 711 A.2d 34, 44-45 (Del. Ch. 1998) (plaintiff would lose unique opportunity in merger acquisition, the value of which could not be quantified).

Although, EchoStar and Dominion agreed that any breach of the Agreement

-22-

would constitute irreparable harm and would warrant an award of injunctive relief, that stipulation without more is insufficient to support an irreparable harm finding. Because the district court articulated no other ground to substantiate a finding of irreparable harm, the court erred in determining Dominion suffered irreparable harm by EchoStar's breach of the Agreement. On this record, it is apparent that should Dominion win in arbitration on the merits, any damage caused by EchoStar's breach of the exclusivity agreement can be quantified in damages. Consequently, we reverse the preliminary injunction entered in this case.[8]

### III

We now briefly address Daystar's appeal. Daystar alleges the district court erred in denying its motion to intervene as an interested party under Federal Rule of Civil Procedure 24 in the preliminary injunction proceedings. Daystar was

---

[8]Because we determine the district court erred in its irreparable harm finding, we need not address the other preliminary injunction factors. *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) ("the moving party must first demonstrate that [irreparable harm] is likely before the other requirements for the issuance of an injunction will be considered"). We likewise decline to address EchoStar's contention that the district court's grant of a preliminary injunction violated the First Amendment of the United States Constitution under *Shelly v. Kraemer*, 334 U.S. 1, 19 (1948) (judicial enforcement of racially restrictive covenants constitute state action). It is commonly accepted that "[i]t is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States*, 196 U.S. 283, 295 (1905).

obviously interested in challenging Dominion's request for a preliminary injunction because Dominion's success would result in the removal of Daystar as one of EchoStar's programming offerings. Even assuming there was substance to Daystar's intervention challenge, however, Daystar's appeal must be dismissed as moot.

After the district court denied Daystar's motion to intervene, Daystar filed a motion to reconsider, or in the alternative, to stay the preliminary injunction proceedings pending appeal. The district court denied these motions and proceeded to conduct an evidentiary hearing on Dominion's motion for a preliminary injunction. After the court issued its order in favor of Dominion, Daystar filed this appeal.

In *Plain v. Murphy Family Farms*, 296 F.3d 975, 981 (10th Cir. 2002), we noted that after a district court has rejected a party's attempt to intervene in an action and also refuses to stay the proceedings pending appeal, the unsuccessful intervening party should, pursuant to Federal Rule of Appellate Procedure 8(a)(2),[9] move before this court for a stay. "[T]he sole purpose of such a stay is

---

[9]

   A motion [for stay pending appeal] may be made to the court of
   appeals or to one of its judges. The motion . . . must state that, a
   motion having been made, the district court denied the motion or
   failed to afford the relief requested and state any reasons given by
   the district court for its action.

FED. R. APP. P. 8(a)(2).

to preserve the status quo pending appeal so that the appellant may reap the benefit of a potentially meritorious appeal." 30 Am. Jur. 2d, *Executions and Enforcement of Judgments* § 34 (2003).

*Plain*'s reasoning is applicable here. Daystar failed to protect its position as an alleged interested party in the preliminary injunction action by seeking a stay of the injunction proceedings with this court. "Such a motion would have provided us with a timely opportunity to review the merits of [Daystar's] claim and decide whether a stay was warranted pending final resolution of [its] appeal. We do not believe we can review now what we could have reviewed then." *Plain*, 296 F.3d at 981. As a result of Daystar's failure to seek a stay in our court, we are not in a position to provide Daystar with the relief it is seeking: the ability to intervene in the preliminary injunction action. The preliminary injunction hearing is over, the district court has issued a ruling, and we have determined on appeal that the district court ruling was erroneous – a result, coincidentally, for which Daystar would have advocated had it been permitted to intervene below.

Moreover, pursuant to the Agreement between EchoStar and Dominion, those parties must now submit to arbitration, where the ultimate question of their dispute – whether EchoStar is in breach of the agreement by broadcasting Daystar and FamilyNet – will be determined. Hence, there no longer remains any further court proceeding in which Daystar can intervene to raise a substantive challenge.

It is thus clear that Daystar's appeal of the denial of its motion to intervene is moot. To the extent that Daystar may be seeking to intervene on appeal to brief the merits of the preliminary injunction, we deny intervention. Daystar's interests have obviously been represented adequately by EchoStar.

## IV

Accordingly, we **REVERSE** the district court's decision granting a preliminary injunction to Dominion pending arbitration of the merits of this case. We hold Daystar's motion to intervene **MOOT** and therefore **DISMISS** Daystar's appeal.

**HARTZ**, Circuit Judge, concurring:

I join Judge Seymour's opinion. I write separately only to comment briefly on the contractual provision that the amount of damages from a breach "would be difficult to determine." Inability to measure damages accurately is, of course, often a key factor in determining whether to grant a preliminary injunction. First, it raises the risk that the injured party will not be adequately compensated, resulting in "unrepaired" harm. Second, the greater the difficulty in measuring damages, the greater the expenditure of judicial resources necessary to resolve the matter; a court could properly decide to avoid that expenditure by issuing a preliminary injunction to prevent any damages that would need to be measured. *Cf. Walgreen Co. v. Sara Creek Prop. Co., B. V.*, 966 F.2d 273, 275-79 (7th Cir. 1992) (comparing administrative burdens of issuing injunction and relying on damages remedy).

Yet it may not always be obvious that accurately measuring damages would be difficult. One might assume that damages from violation of an exclusivity contract can be measured accurately by simply comparing pre-breach and post-breach profits. Expert testimony could be necessary to demonstrate that such a simplistic approach would be mistaken because of the numerous factors, aside from breach of the exclusivity contract, that could affect profits. Therefore, it

seems to me quite appropriate for parties to an exclusivity contract to try to avoid the expense of expert witnesses or the like by agreeing that such a demonstration is unnecessary—it is presumed that damages would be hard to measure. My inclination would be to honor that presumption, which would place the burden on the breaching party to prove that damages could be accurately calculated in the circumstances.

This case, however, does not require us to resolve whether a contractual provision could shift the burden of persuasion, because EchoStar satisfied any such burden. Its expert witness convinced the district court that damages from a breach "would be readily determinable." Although I might not have been persuaded by the expert, we must defer to the district court on this matter, and Dominion has not challenged the finding.